[No. S004552. Crim. No. 23153. Apr. 6, 1989.]

THE PEOPLE, Plaintiff and Appellant, v.
MICHAEL ANGELO MORALES, Defendant and Appellant.

528

530

532

538

**COUNSEL**

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Mark Alan Hart, Carolyn Wendelin Pollack, Gary R. Hahn and Jennifer S. Cady, Deputy Attorneys General, for Plaintiff and Appellant.

John R. Duree, Jr., under appointment by the Supreme Court, for Defendant and Appellant.

**OPINION**

**LUCAS, C. J.**—On May 29, 1981, an amended information was filed in San Joaquin County Superior Court charging defendant Morales with murder, and alleging as special circumstances that (1) the murder was intentional and involved the infliction of torture (Pen. Code, § 190.2, subd. (a)(18); further statutory references are to this code unless otherwise indicated), and (2) defendant intentionally killed the victim while lying in wait (*id.,* subd. (a)(15)). In addition, the amended information alleged that defendant personally used deadly weapons, namely, a knife and hammer (§ 12022, subd. (b)), that he conspired to commit murder (§ 182), and that he forcibly raped the victim (§ 261, subd. (2)). (The amended information also alleged as special circumstances a robbery-murder (§ 190.2, subd. (a)(17)(i)), a rape-murder (*id.,* subd. (a)(17)(iii)), and a heinous and cruel murder (*id.,* subd.

(a)(14)). These three special circumstance allegations, and a robbery charge, were dismissed prior to trial.)

On November 24, 1982, the case was transferred to Ventura County after defendant's motion to change venue was granted. On April 7, 1983, the jury returned its verdict, finding defendant guilty of murder in the first degree, and finding true the two remaining special circumstance allegations. The jury also expressly found that the murder was willful, deliberate and premeditated, that the victim was aware of extreme physical pain inflicted by defendant, and that defendant personally used two deadly weapons (knife and hammer) in the commission of the offense. The jury additionally found defendant guilty of forcible rape and conspiracy to commit murder; the jury specified various overt acts supporting the conspiracy charge.

On April 19, 1983, prior to the commencement of the penalty phase, the trial court granted in part defendant's motion for new trial, ruling that there was insufficient evidence to support the jury's implied finding of first degree murder by torture. (Following the penalty phase, this ruling was vacated on the People's motion and the court instead purported to grant judgment notwithstanding the verdict (n.o.v.) as to the jury's implied finding of first degree torture murder. The People have filed a cross-appeal from this ruling, which we consolidated with the present appeal for purposes of argument.)

On April 19, 1983, the penalty phase commenced and, on April 25, the jury returned a death verdict. On June 14, 1983, the trial court denied defendant's motion to modify the judgment (§ 190.4, subd. (e)), and sentenced defendant to death. This appeal is automatic (§ 1239). As will appear, we have concluded that although the court's purported judgment n.o.v. must be set aside, in all other respects the judgment should be affirmed in its entirety.

## I. THE FACTS

The record discloses that defendant and his cousin, Ricky Ortega, plotted to kill Terri Winchell, a woman who had maintained a sexual relationship with Randy Blythe, Ortega's male lover. (Ortega's case was severed from defendant's case prior to trial.) The evidence indicates that Ortega and Blythe had a homosexual relationship between 1979 and 1981; that Blythe met Winchell in 1980 and became her lover; and that Ortega, accordingly, became upset and was overheard threatening to kill himself or Blythe. Thereafter, in late 1980, a few weeks prior to the murder, Ortega told Glenda Chavez that he was angry at Winchell for accusing him of being a homosexual; Ortega threatened to "pay her back" for her remarks.

On January 8, 1981, Ortega called defendant and told him he was driving Winchell to defendant's apartment. Immediately after this conversation, defendant told his girlfriend, Racquel Cardenas, that he was going to do Ortega a favor and "hurt" a girl by strangling her with his belt. Thereafter (according to defendant's statements to a jailhouse informant, Bruce Samuelson, to Cardenas, and to an acquaintance, Patricia Flores), the men lured Winchell into a car, where defendant attempted to strangle her with his belt until it broke, beat her repeatedly on the head with a hammer until she was unconscious or dead, dragged her body into a field and completed an act of sexual intercourse, and finally stabbed her four times in the chest to assure her death. (A more detailed statement of the facts and evidence is set forth as particular issues are discussed.)

Defendant did not testify in his defense, nor did he present any affirmative defenses. Instead, defense counsel relied primarily on contesting the People's case through cross-examination and argument. (Defendant did present some testimony in an attempt to rebut (1) the positive identification of shoe prints found at the crime scene, and (2) the jailhouse informant's testimony that he discussed the murder events with defendant.)

At the penalty phase, the prosecutor introduced evidence regarding defendant's prior burglary and robbery convictions. Defendant introduced substantial mitigating testimony from friends, acquaintances and a clinical psychologist, each of whom attested to various aspects of his background and character, including his remorse, childhood traumas and "avoidant personality disorder," his problems with school and family, his artistic skills and the like. The psychologist, Dr. Carson, testified that in her opinion defendant was acting under extreme emotional or psychological duress when he killed victim Winchell.

## II. Guilt Phase Contentions

### A. *Denial of Representative Jury*

1. *Defendant's Showing*—Defendant, a person of Hispanic origin, contends that, by reason of defects in the process of selecting jury panels for Ventura County trials, he was denied his constitutional right (U.S. Const., 6th Amend.; Cal. Const., art. I, § 16) to a jury drawn from a representative cross-section of the community. (See *Duren* v. *Missouri* (1979) 439 U.S. 357 [58 L.Ed.2d 579, 99 S.Ct. 664]; *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) He does not complain of any disparity on his own jury, which included three persons with Hispanic surnames. Instead, he challenges the process by which jurors are selected or exempted from jury duty.

According to defendant, although persons of Hispanic origin account for 18.26 percent of all adult persons living in Ventura County, a much smaller percentage of Hispanics actually reported for jury duty on two consecutive sample panels (including his own panel) examined by defendant prior to trial.

Thus, of 364 persons reporting for jury duty on February 28, 1983, only 39 (10.71 percent) had Hispanic surnames, and of 424 persons reporting for jury duty on March 7, 1983, only 37 (or 8.73 percent) had such surnames. A defense statistician testified that it was highly unlikely that such small percentages could have occurred if the jury panel was randomly drawn. According to his testimony, based on the number of panelists and the county-wide percentage of Hispanics, the chances of randomly drawing a jury panel containing only 10.71 percent Hispanics was approximately 1 in 1,000, while the chances of randomly drawing a panel containing only 8.73 percent Hispanics was approximately 1 in 10,000.

Based on the foregoing statistics, defendant moved the trial court to quash the jury panel. The court, following a pretrial evidentiary hearing, denied the motion on the following grounds: (1) use of Hispanic surnames, without further verification, was too imprecise a method on which to base a claim of systematic exclusion; defendant's own witness admitted that a variation of 10 to 15 percent could be expected if surnames alone were used; (2) defendant's own jury was comprised of 25 percent Hispanics, indicating no serious underrepresentation problem existed; (3) the disparities shown by defendant evidently "occurred from perfectly legitimate causes," such as failure to deliver, or to respond to, jury duty notices, noncitizenship, travel distances, financial burden excuses, and the like. As the court noted, "there's really no reason for the Court to pick one [cause] over the other in this case"; and (4) the disparities shown by defendant "are not as great as the disparities in the cases that have been cited to the Court."

2. *Ventura County Procedures*—Defendant renews his contention based on systematic exclusion or underrepresentation of Hispanics arising from Ventura County's allegedly lax jury selection processes. The record indicates that the county draws prospective jurors from a pool of approximately 500,000 persons whose names appear on voters' registration lists and Department of Motor Vehicles records. A computer randomly selects prospective jurors from the pool without regard to race or national origin. Exemptions or excuses are available for such reasons as advanced age, nonresidency, difficulty with the English language, lack of sufficient intelligence, prior felony convictions, travel distance, lack of adequate transportation, extreme financial hardship, physical or mental incapacity, and public health or safety factors. If a person selected for jury duty believes he is entitled to be

excused, he must return a written questionnaire and statement under penalty of perjury to the jury commissioner, who later rules on the request. Thereafter, a list is prepared and a special letter sent to each person who failed to respond to the jury summons, requiring him to explain his absence.

The commissioner grants or denies excuses based on the reasons given in the questionnaire and statement submitted to the prospective jurors. All persons claiming financial hardship must identify their employers, although no attempt is made to verify that employment. The commissioner maintains a written record noting the policies these various employers have adopted regarding pay for jury duty. The commissioner's office seldom independently investigates or verifies claimed excuses or exemptions. The office has conducted no studies to determine the number or percentage of Hispanics on voters' or drivers' registration lists, or the number of such persons who were excused or exempted by the county's system of jury selection.

During the week of March 7, 1983, 1,950 potential jurors were summoned, but only 424 appeared. Of those not appearing, 103 persons were excused for lack of transportation, and 233 were excused for extreme financial hardship. Similar figures were obtained for the week of February 28. Defendant, offering no specific evidence on the subject, speculates that a large number of these excused persons were Hispanics, and that the disparity disclosed by his statistics may well be the result of the county's failure to enforce more vigorously its jury selection program.

3. *Applicable Legal Principles*— ▮ The burden was on defendant to make a prima facie showing that he was denied his right to a jury drawn from a representative cross-section of the community, thereby shifting the burden to the People to explain or justify the selection process. The defendant's showing must include proof that (1) the excluded group is a "distinctive group in the community," (2) representation of this group is unreasonably small in relation to the number of such persons in the community, and (3) such underrepresentation results from a "systematic exclusion" of the group during the jury selection process. (*Duren* v. *Missouri, supra,* 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587]; see *People* v. *Harris* (1984) 36 Cal.3d 36, 50 [201 Cal.Rptr. 782, 679 P.2d 433].)

The parties agree that the first prong of the test was satisfied. (See *Castaneda* v. *Partida* (1977) 430 U.S. 482, 495 [51 L.Ed.2d 498, 511, 97 S.Ct. 1272].) ▮ As to the second prong, the People contend that the "absolute disparity" indicated by defendant's statistics did not reveal a significant disparity; proof of a 10.71 percent and 8.73 percent Hispanic representation on two sample jury panels assertedly was not legally significant when compared to an 18.26 percent community representation. As the People point

out, the resulting absolute disparities (obtained by subtracting the jury representation percentage from the community percentage) amounted to only 7.55 and 9.53 percent. According to the People, these figures are insufficient under federal cases indicating that an absolute disparity in excess of 10 percent must be shown to justify a finding of unreasonable underrepresentation. (See, e.g., *Alexander* v. *Louisiana* (1972) 405 U.S. 625, 630 [31 L.Ed.2d 536, 541-542, 92 S.Ct. 1221] [14 percent disparity sufficient]; *Swain* v. *Alabama* (1965) 380 U.S. 202, 208-209 [13 L.Ed.2d 759, 766, 85 S.Ct. 824] [10 percent disparity inadequate]; *United States* ex rel. *Barksdale* v. *Blackburn* (5th Cir. 1981) 639 F.2d 1115, 1127 [absolute disparities ranging from 4.45 to 11.49 percent deemed insufficient]; *United States* v. *Maskeny* (5th Cir. 1980) 609 F.2d 183, 190 [less than 10 percent disparity held insufficient].)

Defendant urges, however, that we adopt a "comparative disparity" standard which takes into account the relative size of the underrepresented group in the community. (See *People* v. *Harris, supra,* 36 Cal.3d 36, 47, fn. 2 [dictum suggesting such a standard could be "helpful" in deciding underrepresentation cases].) According to defendant, the unfairness of a particular exclusion is magnified where the group's community representation is already relatively small, i.e., a 10 percent disparity is comparatively more unfair to a group comprising only 12 percent of the population (leaving only a minimal 2 percent representation) than to a group comprising 60 percent (leaving a 50 percent representation). Defendant's calculations indicate that, using a system of comparative disparity, Hispanics were underrepresented by 41 and 52 percent on the two sample panels referred to above.

The People, on the other hand, cite several federal cases criticizing the use of a comparative disparity formula. (E.g., *United States* v. *Hafen* (1st Cir. 1984) 726 F.2d 21, 23-24, cert. den. (1984) 466 U.S. 962 [80 L.Ed.2d 561, 104 S.Ct. 2179].) In addition, the People question the reliability of the data used in preparing defendant's statistical analysis: The various figures cited by defendant were obtained by a college instructor, specializing in Hispanic heritage and lifestyles, who examined the various jury lists and counted the Hispanic sounding surnames. No attempt was made to confirm that the names selected were indeed those of persons of Mexican-American background.

Moreover, according to the People, the statistics offered by defendant were derived from an inadequate sample: two consecutive jury panels covering a period of only two weeks. The People observe that far more complete surveys were offered in prior cases, especially where the issue was whether any systematic exclusion had occurred. (See, e.g., *Duren* v. *Missouri, supra,* 439 U.S. at p. 362 [58 L.Ed.2d at p. 585] [weekly venires over eight-month

period]; *People* v. *Harris, supra,* 36 Cal.3d 36, 53 [three-month survey of jury panels in Long Beach area].)

As for the third prong, systematic exclusion, defendant relies on cases suggesting that a statistical discrepancy which discloses a disproportionate underrepresentation can itself indicate a systematic exclusion, i.e., a disparity " 'inherent in the particular jury selection process utilized.' " (See *People* v. *Harris, supra,* 36 Cal.3d 36, 58, quoting *Duren* v. *Missouri, supra,* 439 U.S. at p. 366 [58 L.Ed.2d at p. 588]; *People* v. *Buford* (1982) 132 Cal.App.3d 288, 296 [182 Cal.Rptr. 904] ["*Duren* . . . strongly suggests that in a proper case the second and third prongs of the prima facie case can be satisfied by statistics alone"].) We next review the *Buford* decision and the subsequent cases which question its analysis.

4. *The Buford and Alexander Decisions*—Defendant places primary emphasis on the statistical evidence, cited above, indicating that the chances of similar disparities occurring at random were 1 in 10,000 and 1 in 1,000. In *Buford, supra,* 132 Cal.App.3d 288, involving a similar claim that adult Blacks were underrepresented on Contra Costa County juries, the court employed a "statistical significance" test to conclude that a probability of random chance less than six-tenths of 1 percent (i.e., 1 in 166) was small enough to warrant an inference of systematic exclusion sufficient to shift the burden to the People to explain or justify the county's practices. (*id.,* at pp. 297-299; see also *People* v. *Harris, supra,* 36 Cal.3d 36, 47, fn. 2, and authorities cited.)

*Buford* observed that the defendant in that case had "presented evidence suggesting a plausible systematic explanation for some degree of disparity, i.e., the informal procedure by which Contra Costa County goes about excusing prospective jurors from service. The jury commissioner testified that approximately 40 percent of all prospective jurors are either excused or deferred; that less than 5 percent of those excused or deferred ever submit written verification of their asserted reasons for excuse or deferral; and that approximately 80 percent of the requests . . . are granted over the phone by one of the commissioner's staff, without benefit of written guidelines. . . . [¶] It is doubtful that either the Legislature or the Judicial Council intended that every financial cost be treated as an 'extreme financial burden.' (Cal. Rules of Court, appen., § 4.5(b)(2).) Jury service is, after all, a duty as well as a right. Though characterized as a deferral, through successive exercise, the commissioner's financial hardship policy effectively excuses low-skilled, nonunion employees whose employers usually do not pay for jury service. '[E]xcessive excuses . . . can upset the demographic balance of the venire in essential respects.' (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 273.)" (*People* v. *Buford, supra,* 132 Cal.App.3d 288, 298-299.)

The dissent in *Buford* concluded that the defendant's statistics and other evidence failed to show any "extraordinary" disparity or bad faith on the county's part, and that in any event no one has suggested what the county reasonably could do to assure a greater percentage of Blacks on its jury panels, given the necessity of providing excuses for financial or other hardship, medical problems, and the like. (The defendant had suggested the impractical solution of busing Blacks to the courthouse.)

Defendant submits that *Buford* is controlling, and that the evidence presented here was likewise sufficient to create a prima facie case of systematic exclusion. As previously indicated, however, there are some differences in the counties' excusal practices, such as the requirement of written excuse requests, which suggest that Ventura County is making a greater effort at enforcing its jury summonses. Moreover, the People, noting defendant's exclusive reliance upon the two jury panels sampled by him, argue that the size of the sample was too small, and the duration of the sample too short, to raise a legitimate inference of systematic exclusion. (In *Buford,* at least *four* different panels were scrutinized, and additionally a jury commissioner was questioned about his visual observations of the number of Blacks on Contra Costa County weekly jury panels.)

■ Like the dissent in *Buford,* we believe that a prima facie case of systematic exclusion or underrepresentation of a distinctive class is not made merely by demonstrating that the county's race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw. ■ In the present case, as in *Buford, any* juror could apply for exemption or excusal; the evidence here did not indicate that Hispanics were granted a disproportionate number of exemptions or excuses. By contrast, in *Duren* v. *Missouri, supra,* 439 U.S. 357, Missouri law automatically exempted *all women* from jury duty, upon their request. In other words, the underrepresentation of women on state juries was the immediate and direct result of the state's exemption laws. (See also *Taylor* v. *Louisiana* (1975) 419 U.S. 522, 524 [42 L.Ed.2d 690, 694-695, 95 S.Ct. 692] [similar automatic exclusion of women].) No such direct and immediate result was demonstrated here.

Cases subsequent to *Buford, supra,* 132 Cal.App.3d 288, question the validity of many of its assumptions. First, in a series of cases involving similar claims of underrepresentative juries in Contra Costa County, the courts have concluded that a post-*Buford* tightening of jury excusal procedures (such as requiring written excuse requests, verification of medical excuses, and investigating persons who fail to respond to summonses) indicates that the county is now doing all that can reasonably be expected,

despite continuing disparities of the nature disclosed in *Buford* and the present case. (See *People* v. *Simmons* (1985) 164 Cal.App.3d 1070, 1072-1073 [211 Cal.Rptr. 60]; *People* v. *Pervoe* (1984) 161 Cal.App.3d 342, 352 [207 Cal.Rptr. 622]; *People* v. *Black* (1984) 160 Cal.App.3d 480, 482-483 [206 Cal.Rptr. 744]; *People* v. *Jones* (1984) 151 Cal.App.3d 1029 [199 Cal.Rptr. 185].)

In *People* v. *Alexander* (1985) 163 Cal.App.3d 1189 [210 Cal.Rptr. 306], the defendant raised a similar representative jury claim with respect to Kern County juries, contending that his jury was selected from a panel containing a disproportionately smaller number of Blacks and Spanish surnamed persons than would be expected as a result of random selection. Defendant's claim was based on the *Buford* premise that such underrepresentation resulted from unduly lax practices and methods employed by the jury commissioner's office in excusing persons on grounds of hardship. As *Alexander* observed, "[t]he record suggests that Kern County follows no written standards in excusing jurors, and does not always require written requests before jurors are excused. Jurors are often excused by telephone . . . ." (P. 1198.)

The *Alexander* court recited that the defendant's statistics, based on comparing general county population figures with the actual jury venires during August 1982, showed absolute disparities for Blacks and Spanish surnamed persons of 1.8 and 6.2 percent respectively. Defendant's expert testified that the chances of such disparities occurring randomly were one in ten million for Blacks, and one in one million for Spanish surnamed persons. *Alexander* nonetheless characterized as "speculative" *Buford*'s assumption (*supra,* 132 Cal.App.3d 288) that a disproportionate number of minority group members asked for and received an excuse from jury service, observing that no statistical information had been furnished to support that thesis. (163 Cal.App.3d at pp. 1200-1201.) *Alexander* likewise noted that no statistical evidence had been offered to show that reforms of the county's standards and practices for excusing jurors, such as those suggested by *Buford,* would substantially reduce the disparity. (P. 1201.)

As the court stated, "The fact is, without more factual information, accurate conclusions regarding the cause of the disparity cannot be drawn and any attribution of the cause is wholly speculative. At a minimum, it should be known what the absolute disparity is between minorities in the general population and the number who appear on the jury venire. To the extent that the absolute disparity may be due to economic, cultural, social or language considerations, the difference must be deemed to be 'unavoidable.' (See *People* v. *Harris, supra,* 36 Cal.3d at p. 59.)" (163 Cal.App.3d at p. 1201.)

*Alexander* also observed that the defendant's use of figures derived from the general population, rather than from those eligible to vote, "skews the basic statistics toward showing a larger absolute disparity by an amount unknown. Common experience dictates that the percentage of minorities appearing in the general census figures who are statutorily ineligible for jury service must be large. [Fn. omitted.] Yet those ineligible are included in the gross population figures utilized in the statistics presented by appellant." (163 Cal.App.3d at p. 1202.)

*Alexander* concluded that because of the difficult proof problems in these cases, we should hesitate to assume too readily that the statistical disparity is attributable to causes over which the courts have control. "In reality, it may well be that the amount of the absolute disparity attributed to the procedure of informally excusing jurors is infinitesimal and inconsequential when compared to the other major causes of such disparity. Only further proof and factual information will clarify the significance of the practices utilized in excusing jurors. At this point, attributing the statistical disparity entirely to the practice of orally excusing jurors for undue hardship without written standards would not appear to be justified. *Nor should an assumption of such speculative causation serve as a basis for reversal of a criminal conviction.*" (163 Cal.App.3d at p. 1203, italics added.)

Despite the foregoing comments, *Alexander* stressed that trial courts should continue to assure compliance with all statutory and rule requirements regarding excusal from jury service. (163 Cal.App.3d at p. 1203.) The court also observed that because the People had presented almost no rebuttal evidence, relying on the pre-*Harris* rule forbidding challenges based upon gross population statistics, rather than "voter eligible" statistics, a remand would be appropriate to allow the People to present rebuttal evidence and to enable the trial court to "rule upon this issue in light of such evidence and comments and guidelines herein." (P. 1204, fn. omitted.) The court's order recited that the case was remanded for hearing on the question whether Kern County "was and is doing all that it reasonably may be expected to do to assure" representative juries. (P. 1206.)

5. *Conclusion*—We conclude that defendant here did not make a prima facie showing sufficient to shift the burden of explanation or justification to the People. First, his statistical showing was based upon an inadequate sample. Certainly, no case cited by defendant has held that a prima facie case of systematic exclusion can be made based on statistics derived from only *two* consecutive sample jury panels. The sample was too small in size, and too short in duration, to support a finding of unreasonable underrepresentation or systematic exclusion.

Significantly, *Buford* distinguished an earlier case (*People* v. *Mooring* (1982) 129 Cal.App.3d 453 [181 Cal.Rptr. 71]) on the basis, among others, that "the statistical evidence in that case was more limited as to time . . . ." (132 Cal.App.3d 288, 299, fn. 5.) In *Mooring,* the defendant unsuccessfully asserted a claim that residents of Richmond were underrepresented on county jury panels. Like defendant's presentation herein, the statistical evidence in *Mooring* was drawn from only *two* jury panels; the disparity figures (11.36 percent county-wide distribution; 6.79 and 7.11 percent jury panel representation) were quite similar to those presented here. The *Mooring* court characterized those figures as "insubstantial." (129 Cal.App.3d at p. 459.)

Second, unlike the situation in *Duren, supra,* 439 U.S. 357, where all women were automatically excluded, defendant merely showed possible laxity in enforcing race/class *neutral* excusal practices. Such a showing fails to constitute a prima facie case of systematic exclusion of those minority groups affected by such practices.

Third, Ventura County's jury selection practices, including the requirement of a written request for excuse or deferral, signed under penalty of perjury, adequately distinguish *Buford* and would support a finding (like the Contra Costa County decisions which followed *Buford*) that Ventura County is already doing all it reasonably can to assure a representative jury.

We conclude that defendant's showing was insufficient to raise a prima facie case of systematic underrepresentation.

B. *Premeditated-murder Finding*

The jury was instructed on three separate theories of first degree murder, namely, premeditated murder, murder by torture, and murder by lying in wait. (See § 189.) The jury found defendant guilty of first degree murder, and also expressly found the murder was premeditated. Thus, although defendant challenges the jury's implied findings of lying-in-wait murder and torture murder, if the premeditated-murder finding is sustained we need not consider defendant's contentions regarding these alternative theories of first degree murder. (We do, however, discuss some of these contentions in connection with our review of the lying-in-wait and torture-murder special-circumstance findings.) Accordingly, we turn next to the issues which bear on the premeditated-murder finding.

Defendant acknowledges the jury's special finding of premeditated murder, but argues that (1) there was no statutory basis for that finding, and (2)

the jury was not instructed that such a finding must be based on proof beyond a reasonable doubt. Neither point has merit.

■ Section 1150, with exceptions not pertinent here, requires a "general verdict." (See also § 1152 [special verdicts].) Defendant characterizes the jury's finding as a forbidden special verdict. We disagree. ■ As we pointed out in *People* v. *Burgener* (1986) 41 Cal.3d 505, 537 [224 Cal.Rptr. 112, 714 P.2d 1251], a special verdict "presents conclusions of fact and leaves to the court the task of drawing conclusions of law and rendering judgment upon them where the jury is unable to do so." ■ In the present case, of course, the jury itself rendered additional findings which fully resolved all counts submitted for its consideration.

In *Burgener,* the trial court asked the jury to make a special finding as to whether or not the murder was committed with express malice and with deliberation and premeditation. We held that such special findings were appropriate under section 190.4, subdivision (a), which requires a special finding "on the truth of each alleged special circumstance." A finding as to malice and premeditation was deemed appropriate to support the felony-murder special-circumstance finding, by reason of *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862] (later overruled in *People* v. *Anderson* (1987) 43 Cal.3d 1104, 1138-1139 [240 Cal.Rptr. 585, 742 P.2d 1306]), and its "intent to kill" requirement. (*Burgener, supra,* 41 Cal.3d at pp. 536-538.) We further observed that, in any event, it was not reasonably probable that a more favorable verdict would have been rendered had the jury not been directed to make a special finding as to malice and premeditation. (P. 538.)

*Burgener* seems controlling here. As in that case, a special finding on the issues of premeditation and deliberation may have been deemed appropriate to support the torture-murder special-circumstance finding, which requires proof of an *intentional* murder. (§ 190.2, subd. (a)(18).) In any event, the evidence of premeditation and deliberation was overwhelming in this case, and any error in instructing the jury to decide that issue by a special finding was accordingly harmless.

■ Defendant also contends that the court failed to instruct the jury that its special finding should be based on proof beyond a reasonable doubt. We rejected a similar argument in *Burgener, supra,* 41 Cal.3d 505, 538-540, observing that the jury was adequately instructed regarding the People's general proof burden and the reasonable doubt standard, and that there was "no reasonable possibility that the jury could have been misled as to the appropriate standard for their special finding on express malice. The

instructions taken as a whole indicate that the prosecutor's burden of proof throughout was proof beyond a reasonable doubt." (P. 540.)

Similarly, in the present case, the instructions *repeatedly* emphasized the need to apply a reasonable doubt standard in deciding such issues as defendant's guilt, the degree of his crimes, the truth of the special circumstances, and the weapon enhancement issue. In short, no other standard reasonably could have been applied by the jury.

## C. *Admissibility of Ortega's Statements Implicating Defendant*

Accomplice Ortega was tried separately from defendant. Ortega's former girlfriend, Christina Salaices, was permitted to testify at defendant's trial regarding her conversation with Ortega, five months prior to the Winchell slaying, wherein Ortega indicated that he was planning to kill Randy Blythe (Ortega's male lover, who had begun a sexual relationship with victim Winchell). According to Salaices, Ortega expressed his intent to go to Randy's house, ring his doorbell, stab him when he opened the door, and "turn the knife in him to see the expression on his face." Ortega also said that "Mikey (defendant Morales) would be with him because Mikey wouldn't let him stop. Mikey would help him and Mikey wouldn't let him stop, that Mikey would be there." In addition, Ortega told Salaices that "if Terri [victim Winchell] was there, that she was gonna get it, too."

1. *Admissibility Under Hearsay Exceptions—* Defendant objected on hearsay grounds to the admission of the foregoing statements as they pertained to him, and he renews that objection here. We conclude that the statements were admissible.

Defendant and Ortega had been charged with conspiring to murder Winchell, and Ortega's statements regarding his expectation of defendant's assistance in a related murder plot were relevant to prove the existence and nature of that conspiracy. The People thus contend that Ortega's statements were admissible under either (1) the coconspirator's exception to the hearsay rule (Evid. Code, § 1223), or (2) the state-of-mind exception to that rule (*id.,* § 1250).

 Defendant properly disputes the applicability of the coconspirator's exception. Subdivision (a) of section 1223 of the Evidence Code requires that "[t]he statement was made by the declarant [Ortega] while participating in a conspiracy to commit a crime or civil wrong and in furtherance of the objective of that conspiracy." Yet no evidence was offered to show that Ortega was conspiring *with anyone* to kill either Blythe or Winchell at the time of his conversation with Salaices, five months prior

to Winchell's murder. (See *People* v. *Irwin* (1888) 77 Cal. 494, 504-505 [20 P. 56].) We agree with defendant that, in the absence of proof of an ongoing conspiracy at the time Ortega's statement was made, section 1223 was inapplicable. (It is also doubtful that the statement to Salaices was "in furtherance" of any conspiracy, rather than mere boasting to a girlfriend.)

██ As for the state-of-mind exception, section 1250, subdivision (a), of the Evidence Code creates a hearsay exception for relevant statements "of a declarant's then existing state of mind . . . (including a statement of intent, plan, motive . . .)," when the evidence is offered (1) to prove the declarant's state of mind at that time or any other time, or (2) to explain his acts or conduct. Defendant contends that Ortega's intentions or state of mind were irrelevant to the case against defendant. The People, on the other hand, assert that, in light of the conspiracy charges against defendant, Ortega's statements were admissible to show his earlier intent or plan to draw defendant into a conspiracy involving the killing of Blythe, and possibly Winchell.

We agree with the People. Ortega's admitted plan to kill Blythe, his stated assumption or expectation that defendant would help or encourage him in doing so, and his remark that if Winchell were present she would "get it too," in the aggregate were probative of the question whether the two men later conspired to kill Winchell.

2. *Confrontation Clause*— ██ Defendant argues that the admission of Ortega's statements, coupled with Ortega's unavailability for cross-examination, violated federal confrontation rights guaranteed by the Sixth Amendment. (See *Bruton* v. *United States* (1968) 391 U.S. 123, 135-136 [20 L.Ed.2d 476, 484-485, 88 S.Ct. 1620].) But because Ortega's statements were properly admitted under the well recognized state-of-mind exception to the hearsay rule, the federal confrontation clause would likewise permit admission of such evidence. (See *Bourjaily* v. *United States* (1987) 483 U.S. 171, 182-183 [97 L.Ed.2d 144, 157, 107 S.Ct. 2775]; *United States* v. *Inadi* (1986) 475 U.S. 387, 393 [89 L.Ed.2d 390, 397, 106 S.Ct. 1121]; *Ohio* v. *Roberts* (1980) 448 U.S. 56, 65-66 [65 L.Ed.2d 597, 607-608, 100 S.Ct. 2531].)

D. *Corpus Delicti of Rape*

██ Defendant next argues that the corpus delicti of rape was not established independently of his own statements. More precisely, defendant contends that, apart from his statements, the evidence was insufficient to show that victim Winchell was alive when the act of intercourse took place. (See *People* v. *Stanworth* (1974) 11 Cal.3d 588, 604-605, fn. 15 [114 Cal.Rptr. 250, 522 P.2d 1058].) Defendant points to evidence that Winchell

did not move or change position following the sex act, and that she died quickly after being stabbed. Defendant notes that a pathologist testified that Winchell was alive when the stabbing occurred, and jailhouse informant Bruce Samuelson testified that defendant told him he raped Winchell before stabbing her; evidently, this was the sole testimony indicating that Winchell was alive when the sex act took place.

The People observe that defendant did not raise the corpus delicti objection at trial. (See *People v. Rogers* (1978) 21 Cal.3d 542, 547-548 [146 Cal.Rptr. 732, 579 P.2d 1048].) In addition, the People cite as evidence of a rape (1) the act itself, including the presence of spermatozoa and the condition of Winchell's clothing and body; (2) medical testimony that Winchell was probably alive when stabbed; and (3) medical testimony that Winchell could have survived for 10 minutes *after* being stabbed and beaten on the head. Only slight evidence is required to establish the corpus delicti, which may be inferred from circumstantial evidence. (*People v. Towler* (1982) 31 Cal.3d 105, 115 [181 Cal.Rptr. 391, 641 P.2d 1253].) The foregoing evidence was sufficient to support a finding of rape.

E. *Failure to Instruct on Viewing Jailhouse Informant's Testimony With Distrust*

Defendant next contends that the court erred in failing to instruct the jury, sua sponte, that it should view the testimony of jailhouse informants such as Bruce Samuelson with distrust. We rejected this precise contention in *People v. Hovey* (1988) 44 Cal.3d 543, 565-566 [244 Cal.Rptr. 121, 749 P.2d 776]. (See also *People v. Alcala* (1984) 36 Cal.3d 604, 623-624 [205 Cal.Rptr. 775, 685 P.2d 1126].)

Here, the jury was told about Samuelson's criminal record, and also was informed that the district attorney had agreed to recommend a favorable sentence for Samuelson's pending auto theft and forgery charges, in return for his testimony incriminating defendant. Moreover, the jury was given standard instructions on assessing a witness's credibility, and viewing oral admissions with caution. The court had no sua sponte duty to give additional instructions on assessing jailhouse informant testimony.

## III. SPECIAL CIRCUMSTANCES ISSUES

A. *Lying-in-wait Murder*

The jury found true the lying-in-wait special-circumstance allegation (see § 190.2, subd. (a)(15) ["[t]he defendant intentionally killed the victim while

lying in wait"]). Defendant challenges the foregoing finding on several grounds.

 The instructions told the jury that the special circumstance required proof of an intentional murder committed while lying in wait, and that "[l]ying in wait requires the following elements: waiting, watching, and concealment. . . . The element of concealment . . . may manifest itself either by an ambush *or by the creation of a situation where the victim is taken unawares even though he sees his murderer.* While concealment is an element . . . , it is only a concealment which puts the defendant in a position of advantage from which it can be inferred that lying in wait was part of the defendant's plan to take his victim by surprise." (Italics added.) Finally, the jury was told that if it had a reasonable doubt whether "a perceptible interruption separates the period of concealment and watchful waiting from the period during which the killing takes place, you must find that special circumstance is not true."

1. *Insufficient Instructions*—Defendant argues that the foregoing instructions were inaccurate in failing to require an actual physical concealment. We disagree. Before we discuss the applicable legal principles, however, we briefly summarize the evidence in this case as it pertains to the lying-in-wait issue.

Accomplice Ortega asked victim Winchell to accompany him to a shopping mall to find a gift for a friend. After learning from Ortega that the couple would be arriving soon to pick him up, defendant armed himself with a belt, knife and hammer, telling his girlfriend Racquel Cardenas that he was going to do Ortega a favor and "hurt" a girl by strangling her with his belt. When Ortega and Winchell arrived, defendant climbed in the backseat, directly behind Winchell in the front seat. After Ortega had driven through town to a more isolated location, defendant reached over the seat and attempted to strangle Winchell with the belt. The belt broke, and then he began to beat her head repeatedly with the hammer. Winchell's cries for help from driver Ortega indicated that she was taken by surprise, and was previously unaware of any plan to harm her.

Defendant argues that there was insufficient evidence of his *concealment* from victim Winchell; indeed, the record is clear that Winchell was aware that defendant was seated behind her during the ride. Defendant argues that the foregoing lying-in-wait instructions improperly permitted the jury to predicate a lying-in-wait finding upon a mere concealment of defendant's *purpose,* rather than actual concealment of his *person.* Contrary to defendant's position, however, the cases have indicated that physical concealment from, or an actual ambush of, the victim is not a necessary element of the

offense of lying-in-wait murder. (*People* v. *Sutic* (1953) 41 Cal.2d 483, 492 [261 P.2d 241] [concealment in ambush unnecessary]; *People* v. *Tuthill* (1947) 31 Cal.2d 92, 100-101 [187 P.2d 16] [victim aware of defendant's physical presence prior to attack]; *People* v. *Byrd* (1954) 42 Cal.2d 200, 208-209 [266 P.2d 505] [defendant waited for four hours in front of his former wife's home, entered it, conversed with her, and shot her]; *People* v. *Sassounian* (1986) 182 Cal.App.3d 361, 407 [226 Cal.Rptr. 880] [concealment of defendant's purpose is sufficient]; *People* v. *Hyde* (1985) 166 Cal.App.3d 463, 475-476 [212 Cal.Rptr. 440] [concealment of identity, defendant being disguised as policeman]; *Domino* v. *Superior Court* (1982) 129 Cal.App.3d 1000, 1007 [181 Cal.Rptr. 486] [secret design to take victim by surprise]; *People* v. *Ward* (1972) 27 Cal.App.3d 218, 230 [103 Cal.Rptr. 671] [same].)

As stated in *Ward,* the concealment element "may manifest itself by either an ambush or by the creation of a situation where the victim is taken unawares *even though he sees his murderer.*" (27 Cal.App.3d at p. 230, italics added.) Thus, in *Sassounian, supra,* 182 Cal.App.3d 361, also involving the validity of a lying-in-wait special-circumstance finding, defendant was first observed waiting on a street corner a few minutes before the shooting, then was seen standing by the passenger side of the victim's car while the shooting was occurring, and then seen running away with an accomplice while stuffing a gun into his pants. On appeal, the court rejected his argument that instructions on a lying-in-wait special circumstance were inappropriate because there was no evidence of any *concealment* prior to the shooting.

As the *Sassounian* court explained, "concealment, in the sense that the defendant uses the term, is not required in order to justify and support a 'lying-in-wait' special circumstance. The concealment which is required, is that which puts the defendant in a position of advantage, from which the factfinder can infer that lying-in-wait was part of the defendant's plan to take the victim by surprise. [Citation.] It is sufficient that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim. [Citations.]" (182 Cal.App.3d at pp. 406-407.)

 We conclude that the jury in the present case was properly instructed on the concealment element of the lying-in-wait special circumstance, and that the evidence was sufficient to support a finding of lying-in-wait murder, based on defendant's watchful waiting, from a position of advantage in the backseat, while the car was driven to a more isolated area, and his sudden surprise attack, from behind and without warning, on victim Winchell. (See also *People* v. *Ruiz* (1988) 44 Cal.3d 589, 615 [244 Cal.Rptr.

200, 749 P.2d 854] [defendant, a family member, waited until his victims were asleep before killing them].)

Defendant relies primarily on two cases which assertedly conflict with the foregoing authorities. In *People* v. *Merkouris* (1956) 46 Cal.2d 540, 559-560 [297 P.2d 999], we concluded that lying-in-wait instructions should not have been given under the circumstances in that case. There, the defendant on several prior occasions had been seen sitting in a car parked near the crime scene, but significantly he was not so observed on the day of the murder a few days later. We cited *Sutic, supra,* 41 Cal.2d 483, and *Tuthill, supra,* 31 Cal.2d 92, with apparent approval but distinguished those cases on the ground that in *Merkouris,* "The killings were not accomplished through defendant's watchful waiting in his car; there was no attempt at either concealment or secrecy; and the killings did not follow on the heels of the watchful waiting." (46 Cal.2d at p. 560.)

Thus, although there was a period of watchful waiting in *Merkouris,* it occurred several days prior to the murders. *Merkouris* is thus distinguishable, for in the present case defendant's watchful waiting occurred contemporaneously with the assault, and indeed was part of the "means" through which that assault could be accomplished. (See *Tuthill, supra,* 31 Cal.3d at p. 101.)

Next, defendant cites *Richards* v. *Superior Court* (1983) 146 Cal.App.3d 306, 314-316 [194 Cal.Rptr. 120], to support his position that some period of *physical* concealment is required to sustain a lying-in-wait finding. There, the victim was stabbed to death and robbed after being lured to a garage by the defendants on the pretext that they needed to recover some of their tools. Because there was no indication as to precisely how the murder occurred, and thus no evidence that the defendants "approached the victim from physical concealment after 'watchful waiting,'" the *Richards* court dismissed the lying-in-wait special-circumstance allegation. (Pp. 314-316.) Significantly, *Richards* rejected the argument that the element of concealment could be satisfied merely by taking the victim "unawares" from behind; the court observed that such a rule "would require that we equate concealment with surprise . . . ." (P. 315.)

*Richards* is factually distinguishable, given the absence of *any* period of watchful waiting on the defendants' part. They simply lured their victim to a garage and killed him. Nonetheless, the court's insistence on some period of actual physical concealment stands in conflict with the cases, previously cited, which indicate that, *if a period of watchful waiting is shown* which immediately precedes the assault, a concealment of purpose, coupled with a surprise attack from a position of advantage, will satisfy the concealment

element in lying-in-wait murder. We thus disapprove *Richards* to the extent it would require an actual physical concealment as an element of lying in wait.

2. *Constitutional Considerations—* Defendant suggests that our interpretation of the lying-in-wait statute as not requiring an actual physical concealment runs afoul of constitutional principles barring the arbitrary selection of certain murders as justifying the death penalty. In defendant's view, such an interpretation would provide no meaningful basis for distinguishing capital and noncapital cases, and would thereby allow the arbitrary or irrational imposition of the death penalty. (See, e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 778 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 265-266 [221 Cal.Rptr. 794, 710 P.2d 861].)

Defendant assumes that, unless a physical concealment requirement is imposed, a lying-in-wait finding could be routinely made "in the case of any intentional murder in which the defendant decides to attack his victim, but waits and watches—without notifying his victim of his intent to attack—before inflicting the fatal injuries." In defendant's view, physical concealment adds an element of plotting "far in excess of the level of forethought required for premeditation and deliberation," and additionally suggests "a particularly repugnant form of sneaking cowardice." (See *Richards* v. *Superior Court, supra,* 146 Cal.App.3d 306, 314, fn. 5 [observing that in earlier times, special scorn was reserved for those whose attack after lying in wait deprived the surprised victim of the opportunity for reflection and contrition].)

We reject defendant's constitutional challenge to our interpretation of the lying-in-wait special-circumstance statute. First of all, we do not mean to suggest that a mere concealment of purpose is sufficient to establish lying in wait—many "routine" murders are accomplished by such means, and the constitutional considerations raised by defendant might well prevent treating the commission of such murders as a special circumstance justifying the death penalty. But we believe that an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, presents a factual matrix sufficiently distinct from "ordinary" premeditated murder to justify treating it as a special circumstance.

 The question whether a lying-in-wait murder has occurred is often a difficult one which must be made on a case-by-case basis, scrutinizing all

of the surrounding circumstances. But contrary to defendant's argument, we conclude that an intentional murder undertaken by lying in wait in the foregoing manner is properly among the kinds of aggravated killing which justify society's most severe penalty.

3. *No Cognizable Interruption*— Defendant next contends that the evidence was insufficient to show that the murder was committed *while* defendant was lying in wait (§ 190.2, subd. (a)(15)), that is, that the murder occurred without any "cognizable interruption" following the period of lying in wait. (See *Domino* v. *Superior Court, supra,* 129 Cal.App.3d at p. 1011.) Indeed, defendant suggests that only a "pure ambush" situation would satisfy the *Domino* rule. The point lacks merit.

Section 189 provides that a murder "perpetrated by means of" lying in wait is first degree murder. Section 190.2, subdivision (a)(15), however, describes the lying-in-wait special circumstance as the commission of an intentional murder "*while* lying in wait." (Italics added.) *Domino* held that the use of the word "while" in the latter provision indicated that a closer temporal proximity was required than needed to prove mere lying-in-wait murder. As *Domino* stated, "the killing must take place during the period of concealment and watchful waiting *or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the* period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (129 Cal.App.3d at p. 1011, italics added.)

We need not consider the validity of *Domino*'s restrictive interpretation of the special circumstance provision (cf. *People* v. *Guzman* (1988) 45 Cal.3d 915, 949-952 [248 Cal.Rptr. 467, 755 P.2d 917]), because the evidence in this case clearly would support a finding that defendant's lethal acts flowed continuously from the moment he commenced his surprise attack. Defendant, after watching and waiting until the car and its occupants reached the outskirts of town, suddenly and without prior warning attacked his victim from behind with the intent to kill her. Although victim Winchell evidently survived defendant's initial attempt to strangle and beat her to death, no "cognizable interruption" occurred between the period of watchful waiting and the commencement of the murderous *and continuous* assault which ultimately caused her death.

Defendant speculates that Winchell may have already been aware of his and Ortega's murderous plans, and accordingly she was not taken by surprise. But her screams for assistance from Ortega would support a finding that she was indeed surprised by, and unprepared for, the attack. We

conclude that the lying-in-wait special-circumstance finding should be sustained.

4. *No Corpus Delicti*— ▇▇▇ Defendant next argues that because the evidence of lying in wait was derived primarily from his own extrajudicial statements, the prosecution failed to establish the corpus delicti of the lying-in-wait special circumstance. We have recently rejected the argument that nonfelony-based special circumstances must be supported by independent proof of the corpus delicti (*People* v. *Howard* (1988) 44 Cal.3d 375, 415 [243 Cal.Rptr. 842, 749 P.2d 279]; see *Newberry* v. *Superior Court* (1985) 167 Cal.App.3d 238 [213 Cal.Rptr. 129], 241; *People* v. *McDermand* (1984) 162 Cal.App.3d 770, 798 [211 Cal.Rptr. 773] [no corpus delicti required for lying-in-wait special circumstance]), and we see no reason to reconsider our holding here.

## B. *Torture Murder*

▇▇▇ As previously indicated, the jury was instructed on three theories of first degree murder, namely, premeditation, lying in wait and torture. The jury returned a verdict of first degree murder, expressly finding that the killing was premeditated, and that the victim was "aware of extreme physical pain inflicted" by defendant, a finding from which we can infer a finding of torture murder. Additionally, the jury found true the torture-murder special-circumstance allegation.

Although we need not directly confront defendant's challenges to the jury's torture-murder finding (because the conviction of first degree murder can be sustained on a premeditated-murder basis), a brief examination of the issues is necessary as background to our discussion of the validity of the torture-murder special-circumstance finding.

1. *Intent to Inflict Extreme Pain*—In this case, the evidence indicated that victim Winchell's death was extremely prolonged and painful. ▇▇▇ Severe pain, however, accompanies most homicides and, accordingly, we have held that murder by torture requires a premeditated *intent* to inflict extreme and prolonged pain. (*People* v. *Steger* (1976) 16 Cal.3d 539, 546 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206].) The jury was so instructed in this case.

An intent to inflict pain may be inferred from the circumstances of the crime, the nature of the killing, and the condition of the victim's body. (See *Steger, supra,* at p. 546; see also *People* v. *Robertson* (1982) 33 Cal.3d 21, 51 [188 Cal.Rptr. 77, 655 P.2d 279]; *People* v. *Demond* (1976) 59 Cal.App.3d 574, 583-584 [130 Cal.Rptr. 590].) *Steger* observed that cases reversing

torture-murder convictions "have focused on the lack of evidence of calculation," a factor indicating a killing "in hot anger." (16 Cal.3d at p. 547.) ▮ Although the evidence in the present case was somewhat ambiguous concerning defendant's intent in this regard, it seems clear that such evidence, including the premeditated and prolonged assault, the unusually forcible strangulation attempt, the numerous hammer and stab wounds, the rape, and defendant's earlier statement that he intended to "hurt" and strangle a girl, was sufficient to sustain the jury's implied finding of intent to inflict extreme pain.

2. *Judgment N.O.V.*— ▮ Having concluded the evidence was sufficient to support a torture-murder finding, we must next consider the effect of the trial court's limited judgment n.o.v., which purported to vacate that finding for lack of sufficient evidence of intent to torture. The trial court originally granted a new trial on this issue, later vacating that ruling in favor of a judgment n.o.v. The People have filed a cross-appeal from the judgment n.o.v., arguing that the court lacked authority to enter it.

The precise sequence of events leading to the People's appeal is as follows: Prior to the commencement of the penalty phase, defendant moved for a new trial on various grounds, including insufficiency of the evidence to establish the intent element of torture murder. The trial court granted the new trial motion only as to the jury's implied finding of torture murder, and the penalty phase commenced. (The court, denying a new trial as to the torture-murder special-circumstance finding, mistakenly assumed that an intent to cause extreme pain was not an element of the special circumstance.) The People later moved the court to set aside its new trial order, on the basis that double jeopardy principles would bar a retrial of any murder prosecution based on torture murder. Accordingly, the court vacated its new trial order and granted a judgment n.o.v. as to the jury's implied torture-murder finding. ▮ ▮ ▮ ▮ Following entry of the death penalty judgment, the People filed a cross-appeal from the judgment n.o.v.[1]

▮ We agree with the People that the trial court's purported judgment n.o.v. must be set aside. (See *People v. Morgan* (1977) 75 Cal.App.3d

---

[1] Defendant has moved to dismiss the People's appeal on the basis that the trial court's order was unappealable under section 1238, subdivision (a). That provision contains the various orders appealable by the People, including an order granting a new trial (subd. (a)(3)), an order "modifying the verdict or finding by reducing the degree of the offense or the punishment imposed or modifying the offense to a lesser offense" (subd. (a)(6)), and an order "dismissing or otherwise terminating the action . . . where the defendant has waived jeopardy" (subd. (a)(8)). Because the court allowed defendant's first degree murder conviction to stand, its n.o.v. judgment neither granted a new trial, reduced the degree of the offense, imposed a lesser offense, nor dismissed the action.

Although the trial court's judgment n.o.v. technically is not appealable, we are clearly entitled to review that ruling as part of the automatic appeal properly before us. (§ 1239.)

32, 39 [141 Cal.Rptr. 863] [no judgment n.o.v. available in criminal cases].) Although *Morgan* suggested that such a judgment might be treated as a new trial order, the court's order herein does not fall within any of the statutory grounds for new trial. The only ground that might apply is that the "verdict or finding" was contrary to the law or evidence (§ 1181, subd. 6). As the People observe, however, there was no "verdict or finding" which was set aside, because the court *upheld* the first degree murder conviction. Although the jury's verdict may well have contained an implied finding of torture murder, we have found no case indicating that a new trial order is appropriate to annul an implied finding, especially one affecting only *one* of several potential theories of first degree murder.

Moreover, the fact remains that the trial court vacated its new trial order on the express ground of a concern over the "double jeopardy bar," and accordingly it would be improper to treat the judgment n.o.v. as a new trial order for purposes of sustaining the court's judgment.

We conclude that (1) the jury's implied finding of torture murder was adequately supported by the evidence, and (2) the court lacked the authority to set aside that finding in the manner attempted here.

3. *The Torture-murder Special Circumstance—* Defendant correctly observes that the trial court's instructions regarding the torture-murder special circumstance were flawed because, unlike the torture-murder instructions themselves, they failed to explain that proof of an intent to inflict extreme pain was required to sustain such a finding. (See *People v. Davenport, supra,* 41 Cal.3d 247, 270-271; *People v. Leach* (1985) 41 Cal.3d 92, 109-110 [221 Cal.Rptr. 826, 710 P.2d 893].) Instead, the jury was told only that, to establish the special circumstance, the murder must be intentional, that it involved torture, and that "[t]o prove the infliction of torture, the infliction of extreme pain must be proved no matter how long its duration." The People concede the error but argue it was harmless.

We recently held in *People v. Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d 184] that failure to instruct on an element of a special circumstance is subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]. Thus, we must determine whether, beyond a reasonable doubt, the jury would have found an intent to inflict cruel pain in this case, absent the instructional error.

In another recent case, we held that this precise error may be cured by other instructions which, in the context of defining the crime of torture murder (§ 189), adequately explain that torture requires an intent to inflict

extreme pain. (*People* v. *Wade* (1988) 44 Cal.3d 975, 994-995 [244 Cal.Rptr. 905, 750 P.2d 794].) In the present case, as in *Wade,* the jury was correctly instructed that torture murder requires proof of an "intent to cause cruel pain and suffering." Unlike *Wade,* however, here the jury was also told that the torture-murder instruction "does not apply to the special circumstance allegation of murder by torture. The elements required for that special circumstance allegation will appear later in these instructions." These "later instructions" were, of course, silent regarding the requirement of an intentional infliction of extreme or cruel pain.

Defendant argues that the evidence indicates his sole intent was to quickly strangle Winchell to death; the hammer and knife came into play only after his belt broke during the attempted strangulation. (See *People* v. *Leach, supra,* 41 Cal.3d at p. 110 [evidence of numerous wounds could merely indicate great difficulty in killing victim].) Certainly, defendant's remark to an acquaintance that he intended to "hurt" a girl by strangling her was ambiguous. As previously explained, severe pain accompanies most homicides, but torture requires an additional intention that the victim suffer extreme pain. (*People* v. *Steger, supra,* 16 Cal.3d 537, 546.)

■■■ The jury did not expressly find a torture murder was committed in this case; instead, it found that the murder was premeditated and deliberate, and that the victim was aware of extreme pain. But we may conclude the jury necessarily or impliedly found a torture murder—otherwise there would have been no purpose in its special finding regarding the victim's awareness of the extreme physical pain inflicted by defendant. Thus, we reasonably may sustain the torture-murder special-circumstance finding on the basis that, as instructed, the jury necessarily found an intent to cause extreme pain when it found defendant guilty of torture murder.

The trial court (through its disputed judgment n.o.v.) expressed its doubt as to the sufficiency of the evidence of an intent to torture, and defendant suggests that such misgivings reinforce his contention that the instructional error at issue here was not harmless beyond a reasonable doubt. But as we have seen, the court lacked the authority to issue its judgment n.o.v. Thus, the jury's implied finding of torture murder must stand, and it necessarily would include a finding of intent to cause extreme pain, thereby rendering harmless any instructional error as to the special circumstance.

We conclude that the torture-murder special-circumstance finding should be sustained.

## IV. Penalty Phase Contentions

### A. Denial of Sequestration of Jury

Defendant complains of the trial court's denial of his request to sequester the jury during its penalty phase deliberations, both during lunch hour and a forthcoming weekend. The court denied "lunchtime" sequestration on the stated ground that "we haven't got the facilities or funds to buy them lunch. It's about as simple as that." The court, however, ordered the bailiff to look into the possibility of roping off a section of the cafeteria for the jury's exclusive use. (The record is silent as to whether this was done.) The request for "weekend" sequestration was denied without comment, and the jury was released for the weekend prior to rendering its verdict.

1. *Sequestration Not Mandatory*— ▮ Defendant argues that in a capital case, sequestration should be deemed mandatory. He observes that many other states require such sequestration in order to assure fairness and impartiality by eliminating outside influences upon the jury. (See, e.g., *Lowery* v. *State* (Ind. 1982) 434 N.E.2d 868.)

Prior to 1969, California courts were required to order sequestration in a capital case. (Former § 1121; *People* v. *Chain* (1971) 22 Cal.App.3d 493, 497 [99 Cal.Rptr. 472].) The present statute, however, is clearly discretionary. (See §§ 1121, 1128; cf. *People* v. *Burwell* (1955) 44 Cal.2d 16, 22, 33 [279 P.2d 744]; *People* v. *Erno* (1925) 195 Cal. 272, 282 [232 P. 710].) As we recently held in *People* v. *Ruiz, supra,* 44 Cal.3d 589, 616-617, unlike other jurisdictions, California has no statutory or constitutional basis for judicially adopting a rule requiring sequestration in every capital case.

2. *Abuse of Discretion*— ▮ Defendant next contends that, even if sequestration was not mandatory, the trial court abused its discretion in denying that remedy. It is true that the trial court's expressed reason for denying sequestration (inability to buy lunch for the jurors) was rather insubstantial. (See § 1136, requiring the county, at its expense, to provide a sequestered jury with food, lodging and other necessaries.) On the other hand, defendant made no showing whatever that any special problems existed which made sequestration especially appropriate. Defendant merely pointed out to the court that the penalty phase was the "critical phase of the trial," an observation that would apply to all capital cases. Defendant cited no forthcoming news items or other external factors which might unduly influence the jury. (Indeed, venue already had been changed to a more neutral county to avoid the effects of pretrial publicity.) We conclude that the court did not abuse its discretion in denying sequestration.

B. *Failure to Admonish Jury During Each Adjournment*

At the commencement of the guilt phase deliberations, the court admonished the jury that it might discuss the case only when all 12 jurors were present in the jury room, that deliberations must cease when any jurors were absent, and that during recess the jurors should refrain from discussing the case with "anybody at home, anybody on the jury, court staff, members of the public or anybody at all," until all jurors had returned to the jury room. This admonishment was concededly proper. (See *People* v. *Linden* (1959) 52 Cal.2d 1, 29 [338 P.2d 397].)

Thereafter, immediately prior to the penalty phase closing arguments, the court announced a lunch break and admonished the jury that, "During this recess . . . remember again that you are not to discuss the case among yourselves and not to form or express any opinions or conclusions about the issues." Following the closing arguments, and prior to giving the jury instructions, the court adjourned for the day, stating that, "I am again going to admonish you and this may be the last time I admonish you in open court. I am sure you remember the admonishment by now. It's that you not discuss the case among yourselves or with anyone else, nor permit anyone to discuss the case with you. [¶] And further remember that you are not to form or express any opinions or conclusions about the issues in the case until I submit it to you for decision."

The next morning, the court welcomed the jury, stating, "Before I read the instructions to you I want to remind you of some things that I said before. And I am not going to repeat myself entirely about what goes on in deliberations because I have said these things to you after I sent you out after the guilt phase." The court then instructed the jury, and deliberations commenced. ▮▮▮ Immediately thereafter, the court asked counsel to stipulate that the jurors might be excused at the usual times without being brought into court and readmonished. Defense counsel declined to so stipulate, requesting that the jury be readmonished during lunch and end-of-day breaks. The court denied the request, observing that the jury already had heard the admonishment "about fifty or sixty times."

Defendant now contends that the court erred in denying his request for continued readmonishment. He observes that section 1128 by its terms requires that "[i]f the jurors are permitted by the court to separate, the court shall properly admonish them." (See also §§ 1121, 1122.) Defendant concedes that he has found no case which requires reversal for failure to readmonish, but he observes that no other case involved a denial of an express request to do so.

The general rule is sometimes phrased in a manner supporting defendant's position. Thus, it has been stated that "error in failing to give the required admonition does not require reversal *unless the defendant calls the trial court's attention to the omission at the time of the adjournment,* or unless the defendant on appeal affirmatively points to prejudice resulting from the omission." (*People* v. *Campbell* (1976) 63 Cal.App.3d 599, 610 [133 Cal.Rptr. 815], italics added.)

We believe a more accurate statement of the rule would be that *both* an objection and proof of prejudice are required before a failure to readmonish would be deemed reversible error. As we stated in *People* v. *Linden, supra,* 52 Cal.2d 1, 28-29, "[f]ailure to give the statutory admonition is not ground for reversal where, as here, no prejudice appears. [Citations]." (See also *People* v. *Gastelum* (1965) 237 Cal.App.2d 205, 207 [46 Cal.Rptr. 743].) *Linden* further explained that an abbreviated admonition ("Remember and abide by the admonition heretofore given") is adequate, and that "[t]his is particularly true where no objection is made at the time the abbreviated instruction is given." Thus, *Linden* may suggest that an objection does not satisfy the necessity of proving prejudice.

Prejudice will not be presumed from a failure to admonish. (*People* v. *Heishman* (1988) 45 Cal.3d 147, 175 [246 Cal.Rptr. 673, 753 P.2d 629]; *People* v. *Campbell, supra,* 63 Cal.App.3d 599, 610.) Defendant points to the fact that, during deliberations, an article appeared in a county newspaper which urged the death penalty for defendant. Counsel requested the court to inquire of the jurors whether they had read the article, but the court failed to do so. Defendant now suggests that the court improperly precluded him from showing prejudice from the failure to readmonish.

The People note that the jurors were carefully told to avoid any media coverage of the case, and to divert their attention if they inadvertently became so exposed. The People further observe that defendant failed to move for new trial on this basis (see § 1181, subd. 3), and accordingly failed to submit any juror affidavits which would have supported a showing of prejudice. On this record, given the court's repeated admonishments prior to the penalty phase deliberations, we have no reasonable basis for finding any likelihood of prejudice to defendant from the court's failure to readmonish the jurors.

## C. *Other-crimes Instructions*

At the penalty phase, the People introduced evidence disclosing that defendant was convicted of burglary in 1979, and robbery (two counts) in

1981. With respect to the robbery, the People introduced testimony regarding the surrounding circumstances, including defendant's assaults upon the store owner and his pregnant wife. In addition, during the guilt phase, cellmate Samuelson testified that defendant, while the men were in jail, had solicited him to murder Racquel Cardenas and Patricia Flores testified that defendant, a few days after Winchell's murder, had made threatening gestures toward Flores with a hammer, telling her he would "take care of" her if her fiance asked him to do so. (The prosecutor did not rely on either the Samuelson or Flores testimony as an aggravating circumstance at the penalty phase, although he did mention the hammer incident in his closing argument.) Defendant now contends the court erred in failing to instruct the jury that it should not consider these various prior offenses unless it found beyond a reasonable doubt they were committed. (*People* v. *Robertson, supra,* 33 Cal.3d 21, 54.)

 With respect to the burglary and robbery, the People observe that the *Robertson* instruction need not be given where defendant already has been convicted of the prior offense. (See *People* v. *Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301].) Defendant correctly points out, however, that here the evidence extended beyond the mere fact of conviction of robbery, and included testimony regarding defendant's assault on the robbery victims. As noted in *Gates,* 33 Cal.3d at page 1202, footnote 13, a *Robertson* instruction should be given where the penalty phase evidence discloses a crime in addition to the one of which the defendant was convicted. Assuming that *Robertson* instruction should have been given, it is very doubtful that defendant was prejudiced by the omission. The assaults involved were relatively minor, involving no serious or permanent injuries to either victim. Moreover, the victims' testimony was uncontradicted and unimpeached. (See *Gates,* at p. 1202 [finding harmless error under similar circumstances]; *People* v. *Miranda* (1987) 44 Cal.3d 57, 97-98 [241 Cal.Rptr. 594, 744 P.2d 1127] [same].)

 As for the Samuelson and Flores guilt phase testimony, although such evidence indeed may have indicated that defendant had committed prior crimes, the evidence was admitted for other reasons and was not relied on by the prosecutor as an aggravating factor supporting the death penalty. Accordingly, *Robertson* is inapplicable to such testimony. (See *People* v. *Robertson, supra,* 33 Cal.3d at p. 60 [conc. opn. by Broussard, J.]; *People* v. *Williams* (1988) 44 Cal.3d 1127, 1146-1147 [245 Cal.Rptr. 635 [751 P.2d 901].) Additionally, the Flores testimony involved defendant's acts and statements shortly after the Winchell murder, and may have been admissible as a circumstance surrounding that offense (§ 190.3, subd. (a)). Thus, the prosecutor's reference to that testimony in his penalty phase argument did not invoke *Robertson*. We conclude that the failure to

give the "reasonable doubt" instruction with respect to defendant's other crimes was, at worst, harmless error.

## D. *Inadmissibility of Subsequent Crime*

The robbery referred to in the preceding section occurred before defendant's murder of Terri Winchell. He was *convicted* of that robbery, however, following the murder but prior to trial. Accordingly, defendant correctly observes that evidence of his conviction of this "subsequent" offense was inadmissible under section 190.3, subdivision (c), pursuant to the holding in *People* v. *Balderas* (1985) 41 Cal.3d 144, 201-203 [222 Cal.Rptr 184, 711 P.2d 480].

In *Balderas,* the court held that prior convictions are admissible under subdivision (c) only if they were entered prior to the charged capital offense. The People now urge that we reconsider *Balderas,* but it seems clear that any *Balderas* error was harmless in this case, given the fact that the evidence surrounding the commission of the robbery was properly admissible under section 190.3, subdivision (b). As *Balderas* observes, "subdivision *(b)* imposes *no* time limitation on the introduction of 'violent' crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life." (41 Cal.3d at p. 202, italics in original.) The additional fact that defendant was *convicted* of that offense could have added very little to the total picture considered by the jury, a picture which properly included defendant's prior burglary conviction, his commission of a violent robbery, and the aggravated nature of the Winchell offense.

## E. *Extreme Mental Disturbance and Extreme Duress*

At the penalty phase, defendant relied in part on evidence of his emotional and developmental problems, resulting in a "personality disorder" which included a fear of social contact with persons other than his cousin, Ricky Ortega. The court instructed the jury regarding the various statutory sentencing factors, including section 190.3, factors (d) and (g), which permitted the jury to consider whether defendant was under the influence of "extreme mental or emotional disturbance" (factor (d)), and whether he acted under "extreme duress" of another person (factor (g)). Defendant unsuccessfully moved the court to strike the word "extreme" from these instructions on the ground that it improperly limited the mitigating evidence defendant was entitled to submit to the jury.

We rejected a similar contention in *People* v. *Ghent* (1987) 43 Cal.3d 739 [239 Cal.Rptr. 82, 739 P.2d 1250], involving the 1977 death penalty law and its reference to "extreme mental or emotional disturbance" (former § 190.3,

factor (c)). In *Ghent,* we stated that the "catchall" provision of former section 190.3, factor (j) ("any other circumstance which extenuates the gravity of the crime") was sufficient to permit the jury to take into account "a mental condition of the defendant which, though perhaps not deemed 'extreme,' nonetheless mitigates the seriousness of the offense." (P. 776.) We also observed that nothing in the record indicates that the jury failed to give proper weight to defendant's mitigating evidence. (*Ibid.*)

In the present case, in addition to giving the "catchall" section 190.3, factor (k) instruction of the 1978 death penalty law, the court expressly advised the jury that in deciding penalty, it should consider and weigh "any sympathetic factor of defendant's background raised by the evidence as a mitigating circumstance." Moreover, the court told the jury that the list of statutory mitigating circumstances merely included "examples of some of the factors that you may take into account," and that "[y]ou may also consider any other circumstances as reasons for not imposing the death sentence."

Defendant notes that the prosecutor argued to the jury that the evidence failed to show any "extreme" emotional disturbance or duress. But the prosecutor never argued that *only* an extreme condition could be considered by the jury in deciding penalty, and the court's instructions made it clear the contrary was true. We conclude that the jury was properly instructed in this regard. (The trial court's elaborate instructions regarding the jury's sentencing duties also readily circumvented the pitfalls catalogued in *People v. Brown* (1985) 40 Cal.3d 512, 538-545 [220 Cal.Rptr. 637, 709 P.2d 440].)

F. *Failure to Reinstruct on Viewing Defendant's Extrajudicial Statements With Caution*

▆▆▆ Defendant next contends that the court erred in failing to reinstruct, sua sponte, at the penalty phase, that a defendant's own oral admissions should be viewed with caution. (See *People v. Romo* (1975) 14 Cal.3d 189, 194 [121 Cal.Rptr. 111, 534 P.2d 1015].) (Such an instruction was given at the guilt phase.) The argument is without merit.

At the penalty phase, defendant's sister, Lisa Morales, testified regarding defendant's family loyalty and his promise to help her if she ever needed anything. On cross-examination, the prosecutor elicited the fact that defendant once told her that if anyone ever hurt her, he would "help" her with them. In other words, according to Miss Morales, "I guess [he would] hurt them the way they had hurt me."

Thereafter, defense counsel called defendant's friend, Lydia Lopez, who gave similar favorable testimony regarding defendant's willingness to help

his friends. As an example, Mrs. Lopez indicated that defendant, after learning that her husband was angry with her, had once remarked that if her husband ever hurt her, "I don't know what I will be able to do," but indicated he would be there if anything happened. On cross-examination, the prosecutor asked if defendant had "offered to take care of your husband." The witness replied that defendant had made no such statement, but "just said he didn't know what he could do."

Assuming that the oral admissions rule applies to the penalty phase, it seems apparent that defendant's remarks in these two instances cannot be characterized as "admissions" for purposes of the rule requiring a cautionary instruction. In neither instance was defendant acknowledging or admitting any fact particularly damaging to his position at the penalty phase; the gist of the testimony was that defendant's loyalty to his relatives and friends extended to physically defending them if they needed such defense. In light of the other evidence in the case, such testimony seems quite harmless.

As we stated in *Romo, supra,* 14 Cal.3d at page 194, the trial court should give the cautionary instruction, sua sponte, "where it is warranted by the evidence." We conclude that the evidence elicited from witnesses Morales and Lopez was insufficient to invoke that rule.

■ In a related argument, defendant observes that the jury was instructed that it might consider guilt phase evidence in deciding the penalty issue, and that the prosecutor, in his penalty phase closing arguments, relied upon some oral statements of defendant introduced at the guilt phase. Although the guilt phase jury was properly instructed to receive such statements with caution, defendant now contends that, in light of the prosecutor's subsequent use of the statements at the penalty phase, the jury should have been reinstructed on the matter.

The prosecutor referred to defendant's guilt phase statements only for purposes of attempting to rebut his penalty phase evidence indicating he felt remorse for his offenses. Defendant cites no authority supporting the necessity for a sua sponte instruction under such limited circumstances. As the People point out, defendant may well have had tactical reasons for not calling the jury's attention to his statements in a special penalty phase instruction. (See *People* v. *Davenport, supra,* 41 Cal.3d 247, 281.) Moreover, a reasonable jury would assume such "generic" instructions remained applicable at the penalty phase. (See *People* v. *Brown* (1988) 46 Cal.3d 432, 460 [250 Cal.Rptr. 604, 758 P.2d 1135].)

G. *Failure to Reinstruct Regarding Defendant's Failure to Testify*

■ Defendant elected not to testify at either the guilt or penalty phase. At the guilt phase, the jury was instructed not to draw adverse inferences

from defendant's failure to testify, but the jury was not reinstructed on that subject at the conclusion of the penalty phase. Defendant asserts the omission constituted reversible error.

Defendant did not request that the jury be reinstructed, and he cites no cases requiring sua sponte reinstruction. The People note that there is no sua sponte duty to give a "no adverse inferences" instruction of the kind involved here, either at the guilt phase (*People v. Preston* (1973) 9 Cal.3d 308, 316 [107 Cal.Rptr. 300, 508 P.2d 300]; *People v. Gardner* (1969) 71 Cal.2d 843, 852-854 [79 Cal.Rptr. 743, 457 P.2d 575]), or the penalty phase (*People v. Gates, supra,* 43 Cal.3d 1168, 1208). But these cases do not discuss whether an obligation to *reinstruct* exists once a guilt phase instruction has been given. It is evident, however, that defense counsel reasonably could decide, as a tactical matter, not to remind the jury of defendant's failure to testify in his defense. As *Gardner* observes, it is "debatable" whether the foregoing instruction is to defendant's advantage. (*Id.,* at p. 854.) Moreover, as previously noted, a reasonable jury would assume the instruction continued to apply at the penalty phase. (See *People v. Brown, supra,* 46 Cal.3d at p. 460.) Accordingly, we conclude that the trial court had no sua sponte duty to reinstruct as to defendant's failure to testify.

## H. *Guilt Phase Admission of Statements by Ortega and Samuelson*

 Earlier in this opinion, we discussed defendant's contention of errors in admitting, at the guilt phase, statements of defendant's cousin, Ricky Ortega, and jailhouse informant Samuelson which implicated defendant. He now contends that such errors likewise infected the penalty phase, providing the jury with "extremely damning character evidence."

As we have explained, no error occurred in admitting such statements. Accordingly, defendant's present argument must be rejected.

## I. *Prosecutor's References to Defendant's Lack of Remorse*

 Defendant complains of prosecutorial argument to the effect that defendant failed to express any remorse for his acts. No objection was made to these comments, and accordingly the issue was waived. (*People v. Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468]; see *People v. Miranda, supra,* 44 Cal.3d at p. 107.) Moreover, we have held that the prosecutor properly may point out to the jury the absence of a particular mitigating factor such as remorse. (*People v. Ghent, supra,* 43 Cal.3d 739, 771; see also *Miranda, supra,* at pp. 111-112.) Here, the jury was specifically instructed at defendant's request that it could consider remorse as a mitigating factor. Indeed, some of defendant's penalty witnesses testified that he wished he

had not committed the offenses, and defense counsel referred to defendant's remorse in his closing argument. Moreover, the prosecutor at no time commented upon defendant's failure to testify or to confess to his crimes. His argument was limited to defendant's lack of remorse. We conclude that no misconduct occurred here.

### J. Prosecutor's Demonstrative Use of a Hammer

■■■ At the conclusion of his closing penalty argument, the prosecutor vividly demonstrated the number of hammer blows received by victim Winchell, stating: "This is my last opportunity to say anything to you about this case, but there is one thing I want you to think about in the jury room and it's the essence of this case. Just think about this because this is what happened. Twenty-three times. It was just like this." The prosecutor thereupon counted from 1 to 23 as he swung the hammer in the air, acting out the 23 hammer blows suffered by Winchell. A defense objection following the count of 12 was overruled.

■■■ We have stated that "[a]lthough appeals to the sympathy or passions of the jury are inappropriate at the guilt phase [citation], at the penalty phase the jury decides a question the resolution of which turns not only on the facts, but on the jury's moral assessment of those facts as they reflect on whether defendant should be put to death. It is not only appropriate, but necessary, that the jury weigh the sympathetic elements of defendant's background against those that may offend the conscience. [Citations]. In this process, one of the most significant considerations is the nature of the underlying crime. (See Pen. Code, § 190.3, [factor] (a).) Hence assessment of the offense from the victim's viewpoint would appear germane to the task of sentencing." (*People v. Haskett* (1982) 30 Cal.3d 841, 863-864 [180 Cal.Rptr. 640, 640 P.2d 776].)

*Haskett* also pointed out, however, that the court should maintain a careful balance between probative and prejudicial evidence or argument, and should curtail "inflammatory rhetoric that diverts the jury's attention from its proper role or invites an irrational, purely subjective response . . . ." (30 Cal.3d at p. 864.)

*Haskett* approved prosecutorial argument at the penalty phase inviting the jurors to put themselves in the victim's shoes and to imagine suffering the acts inflicted on her. (30 Cal.3d at p. 863; see also *People v. Hovey, supra,* 44 Cal.3d 543, 576 [prosecutor's use of large portrait of child victim during penalty phase arguments]; *People v. Fields* (1983) 35 Cal.3d 329, 362, and fn.14 [197 Cal.Rptr. 803, 673 P.2d 680].) ■■■ Here, the prosecutor's hammer blows were intended to accomplish the same end as in

*Haskett,* namely, to emphasize the heinous nature of the murder and the extent of the victim's suffering. Although counting out 23 hammer blows was probably unnecessary to accomplish this purpose, nonetheless, any misconduct could not have been prejudicial. The jury was presented with medical and other testimony outlining the cause and extent of Winchell's wounds. No reasonable juror aware of such evidence would have been swayed to vote for death by the prosecutor's demonstrative methods.

### K. *Automatic Motion to Modify Sentence*

 Finally, defendant argues that the trial court relied on inadmissible evidence, and failed to consider defendant's mitigating evidence, in passing on his motion to modify the death sentence. (See § 190.4, subd. (e).) We disagree.

In every case in which a death penalty is returned, section 190.4, subdivision (e), requires the trial court to "review the evidence, consider, take into account, and be guided by the aggravating and mitigating circumstances . . . and . . . make a determination as to whether the jury's findings and verdicts that the aggravating circumstances outweigh the mitigating circumstances are contrary to law or the evidence presented. The judge shall state on the record the reasons for his findings."

Defendant urges the court committed three errors in its statutory modification ruling. First, he contends that the court improperly considered inadmissible evidence, including his robbery conviction occurring subsequent to the Winchell murder, and the statements of Ricky Ortega implicating him. Second, defendant argues that the court improperly considered both special circumstance findings, including the torture-murder finding. Third, the court assertedly failed to consider defendant's evidence of duress as a mitigating factor because it was not "extreme."

As we have previously explained, the evidence of Ortega's statements and defendant's commission of a violent robbery was admissible on the grounds set forth herein. Although the fact of defendant's *conviction* of the robbery was inadmissible (*People v. Balderas, supra,* 41 Cal.3d 144), and should not have been considered by the court in deciding defendant's motion to modify sentence, the record does not indicate that the court placed undue weight upon that factor. As for the torture-murder special-circumstance finding, we have upheld that finding herein and accordingly it was proper for the court to consider it. With respect to the duress issue, although the trial court found no evidence of "extreme duress," there is no indication that it failed to consider the duress evidence offered by

defendant. The record discloses that the court considered all of defendant's mitigating evidence, but believed that such evidence was insufficient to justify a modified sentence.

We conclude that the court committed no prejudicial errors in ruling on defendant's motion to modify the sentence.

The purported judgment n.o.v. as to the implied torture-murder finding is set aside, and in all other respects the judgment is affirmed.

Panelli, J., Eagleson, J., Kaufman, J., and Arguelles, J.,* concurred.

**MOSK, J.**—I concur in the affirmance of the judgment as to guilt: my review of the record discloses no prejudicial error on that issue. I dissent, however, from the affirmance of the judgment as to penalty: in my opinion, the special circumstance findings must be set aside and the judgment of death must accordingly be reversed as unsupported as a matter of law.

At the guilt phase the trial court instructed the jury on the special circumstances of murder while lying in wait (Pen. Code, § 190.2, subd. (a)(15)) and murder by torture (*id.,* § 190.2, subd. (a)(18)). As to the former, the court stated in relevant part: "To find that the [lying-in-wait] special circumstance . . . is true, each of the following facts must be proved: [¶] 1. That the defendant intentionally killed the victim, and [¶] 2. That the murder was committed while defendant was lying in wait . . . . [¶] Lying in wait requires the following elements: waiting, watching, and concealment. . . . [¶] The element of concealment which is required in lying in wait may manifest itself either by an ambush or by the creation of a situation where the victim is taken unawares even though he sees his murderer. [¶] While concealment is an element necessary before lying in wait can be applied, it is only a concealment which puts the defendant in a position of advantage from which it can be inferred that lying in wait was part of the defendant's plan to take his victim by surprise." As to the latter special circumstance, the court stated in relevant part: "To find that the [torture-murder] special circumstance . . . is true, each of the following facts must be proved: [¶] 1. That the murder was intentional, and [¶] 2. That the murder involved the infliction of torture."

Following deliberations at the guilt phase, the jury found each of the special circumstance allegations to be true and thereby determined that defendant was eligible for capital punishment. At the penalty phase they returned a verdict of death.

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

I believe that the lying-in-wait special circumstance finding must be vacated. The trial court erred by instructing the jury as it did on the allegation. I agree with the majority that the elements of the special circumstance are waiting, watching, and concealment. I cannot agree, however, "concealment" means anything other than actual *physical* concealment. In *Richards v. Superior Court* (1983) 146 Cal.App.3d 306 [194 Cal.Rptr. 120], the Court of Appeal held—consistently with reason and authority—that " ' "[t]he gist of 'lying in wait' is that the person places himself in a position where he is waiting and watching *and concealed from the person killed* with the intention of inflicting bodily injury upon' such person or of killing such person." ' " (*Id.,* at p. 316, quoting *People v. Thomas* (1953) 41 Cal.2d 470, 473 [261 P.2d 1], and adding italics.) Judged against this holding, the trial court's instruction in this case effectively omitted the physical concealment element of the special circumstance and as a consequence was erroneous.

Further, the trial court's error was prejudicial. In *People v. Odle* (1988) 45 Cal.3d 386, 410-415 [247 Cal.Rptr. 137, 754 P.2d 184], the court held that failure to instruct on an element of a special circumstance is subject to harmless error analysis under the harmless-beyond-a-reasonable-doubt test of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].[1] As noted above, the trial court, in practical effect, failed to instruct on physical concealment. Having reviewed the record in its entirety, I am simply unable to declare a belief, beyond a reasonable doubt, that the jury would have found physical concealment had they been properly instructed. The reason is manifest: the evidence establishes without dispute that defendant was *not* physically concealed from the victim.

But even if the majority were correct in holding that the lying-in-wait special circumstance requires concealment of only the defendant's true purpose and intent, I would nevertheless be compelled to conclude that the special circumstance finding must be vacated: insofar as it purports to serve as a predicate for the determination of death-eligibility, it is constitutionally invalid.

---

[1] In a concurring opinion in *People v. Kimble* (1988) 44 Cal.3d 480 [244 Cal.Rptr. 148, 749 P.2d 803], I expressed the view that failure to instruct on an element of a special circumstance is automatically reversible, subject to the following exceptions: (1) the erroneous instruction was given in connection with a special circumstance allegation that was not found true; (2) the defendant conceded the issue underlying the omitted element; and (3) the issue was necessarily resolved adversely to the defendant under other, properly given instructions. (*Id.,* at pp. 517-526 (conc. opn. of Mosk, J.).) I continue to adhere to that view as a matter of personal belief. I have not succeeded, however, in persuading my colleagues of the soundness of my position. After reflection, I have decided not to beat a rataplan. Accordingly, I join the majority in concluding that failure to instruct on an element of a special circumstance is subject to harmless error analysis under the *Chapman* test, but do so only under compulsion of *People v. Odle, supra,* 45 Cal.3d 386.

To withstand scrutiny under the Eighth Amendment as a valid predicate for the determination of death-eligibility, a special circumstance "'. . . must . . . provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not."'" (*Carlos* v. *Superior Court* (1983) 35 Cal.3d 131, 151 [197 Cal.Rptr. 79, 672 P.2d 862], overruled on other grounds in *People* v. *Anderson* (1987) 43 Cal.3d 1104 [240 Cal.Rptr. 585, 742 P.2d 1306]; see *People* v. *Green* (1980) 27 Cal.3d 1, 61 [164 Cal.Rptr. 1, 609 P.2d 468].) Whether the basis for distinguishing between cases is "meaningful" depends on whether it serves the principal social goals of the death penalty: retribution and deterrence. (*Carlos* v. *Superior Court, supra,* 35 Cal.3d at p. 149.)

In my view, the lying-in-wait special circumstance does not pass constitutional muster. My reasons are as follows. First, this special circumstance does not distinguish the few cases in which the death penalty is imposed from the many in which it is not. Indeed, it is so broad in scope as to embrace virtually all intentional killings. Almost always the perpetrator waits, watches, and conceals his true purpose and intent before attacking his victim; almost never does he happen on his victim and immediately mount his attack with a declaration of his bloody aim. Second, the lying-in-wait special circumstance does not provide a meaningful basis for distinguishing between murderers who may be subjected to the death penalty and those who may not. To my mind, the killer who waits, watches, and conceals is no more worthy of blame or sensitive to deterrence than the killer who attacks immediately and openly.

Further, I believe that the torture-murder special circumstance finding must also be vacated. Like the majority, I am of the opinion that the trial court erred by instructing the jury as it did: intent to torture—i.e., intent to inflict extreme physical pain—is an element of this special circumstance (*People* v. *Davenport* (1985) 41 Cal.3d 247, 260-271 [221 Cal.Rptr. 794, 710 P.2d 861]); the court, however, failed to so instruct. But unlike the majority I cannot conclude the error was harmless. Having reviewed the record in its entirety, I am simply unable to declare a belief, beyond a reasonable doubt, that the jury would have found an intent to inflict extreme physical pain had they been properly instructed. The evidence is clear in showing that defendant intended to kill the victim: his use of the belt, the hammer, and the knife compels the conclusion. But the evidence is far from clear in revealing whether he intended to inflict extreme physical pain.

Indeed, on defendant's motion for new trial the trial court expressly found that there was "insufficient credible evidence" to support a finding that defendant intended to inflict extreme physical pain, and as a result

vacated what it took to be the jury's implied verdict or finding of guilty of murder by torture. The court stated as follows.

"If somebody wants to cause torture he doesn't use a belt. That's the first thing the defendant did was try and strangle the victim with a belt. It was a rather clumsy attempt. The belt broke and so he went on to the hammer. And each of the—each of the blows with a hammer it appears to me to be more consistent with an attempt to kill than an attempt to simply cause pain. They were all in the head area. Again, a clumsy attempt.

"He couldn't accomplish his objective with a hammer so then he eventually used the knife and finally rendered the victim dead with the knife.

"But we don't have any of these elements that we do in the other cases that support the intent element where we have wounds to an area of the body which would be nonfatal. And simply the statement that the defendant wanted to hurt the girl I don't think raises these clumsy attempts to kill to an indication of an intent to inflict pain separate and apart from the killing."

The majority assert that the jury impliedly found that defendant was guilty of murder by torture and hence impliedly found that he acted with intent to inflict extreme physical pain. The assertion is without basis. As the Attorney General himself argues, the jury made no finding, express or implied, on murder by torture: they merely found that the victim "was aware of extreme physical pain inflicted" by defendant. Such a finding, of course, implies neither a verdict of guilty of murder by torture in general nor a finding of intent to inflict extreme physical pain in particular.

The majority state: "we may conclude the jury necessarily or impliedly found a torture murder—otherwise there would have been no purpose in its special finding regarding the victim's awareness of the extreme physical pain inflicted by defendant." (Maj. opn. at p. 562, *ante*.) They are wrong. The jury made the finding because the trial court directed them to expressly resolve the issue of awareness of extreme physical pain. And the trial court directed them to do so because it perceived "some problem with the language in the [standard] torture special circumstance instruction," and desired to preserve a finding of true—if such a finding was made—against invalidation on appeal.[2]

---

[2] The language the trial court found problematic was the following: "To prove the infliction of torture, the infliction of extreme physical pain must be proved no matter how long its duration. [¶] Awareness of pain by the deceased is not a necessary element of torture." The court evidently believed that "pain" necessarily entailed *awareness of pain* on the part of the sufferer.

But even if the jury could be understood to have impliedly found that defendant intended to inflict extreme pain on the victim, its "finding" was vacated by the trial court. In deciding whether to set aside a verdict or finding on motion for new trial, the trial court "has very broad discretion and is not bound by conflicts in the evidence, and reviewing courts are reluctant to interfere with [its] decision . . . unless there is a clear showing of an abuse of discretion." (*People* v. *Robarge* (1953) 41 Cal.2d 628, 633 [262 P.2d 14].) In this case the trial court plainly acted within the broad scope of its discretion and cannot be shown to have committed any abuse.

For the foregoing reasons, I would vacate the special circumstance findings and accordingly reverse the judgment of death as unsupported as a matter of law.

**BROUSSARD, J.**—I dissent. Defendant made a prima facie showing that the system by which jury venires are selected in Ventura County produces venires which substantially underrepresent the Hispanic population of the community. In the absence of any rebuttal from the People demonstrating that the underrepresentation was legitimately caused, or served an important state interest, defendant's conviction must be reversed.

"In order to establish a prima facie violation of the fair-cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process." (*Duren* v. *Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 586-587, 99 S.Ct. 664].)

Defendant made out a prima facie case under *Duren, supra,* 439 U.S. 357. He showed that a cognizable class, that is, Hispanics, made up 18.26 percent of the adult population of Ventura County, where he was tried. He showed significant underrepresentation in that in two consecutive venires, Hispanics made up only 10.71 and 8.73 percent of the venire. He showed systematic underrepresentation with statistical evidence that the underrepresentation was not a chance occurrence, but showed that the system of selection was not random. He suggested that the fault in the system was with Ventura County's practice of inadequately enforcing its summons to jury service.

The majority find that defendant's sample was too small, and of too short duration, to establish the unrepresentativeness of the venire or the systematic nature of the exclusion. The majority speak as if the sample size is two,

referring to the two venires. But for statistical purposes, the sample is defined by the number of jurors called. In the first week, 1,650 jurors were summoned, and in the second week, 1,950 jurors were summoned. The expert testimony was uncontroverted that these samples were large enough to provide a meaningful result.

Defendant's expert testified that persons with Spanish surnames accounted for 18.26 percent of the adult population of the county. Of the 364 who appeared for service on February 28, 1983, 39, or 10.71 percent, had Spanish surnames. Of the 424 persons reporting for service on March 7, only 37, or 8.73 percent, had Spanish surnames.

Another expert, a consulting actuary, explained the statistical significance of the numbers. The probability that out of 364 persons in the venire, only 39 would be Hispanic was 1 in 1,000. The probability that out of 424 persons in a venire, only 37 would be Hispanic, was 1 in 10,000. He explained the actual number of Hispanics appearing for the venire in the second sample was five standard deviations from what would occur in a random sample, and that using the standard reference text of normal distribution, the occurrence of five standard deviations from the normal has a probability of approximately one out of ten thousand. He concluded that with respect to either sample, it would be extremely unlikely that the panels were drawn randomly. He found the two samples conclusive. "Having the two consecutive panels with such minute probabilities of occurring leads me to conclude that the sample is not randomly drawn." He then checked his conclusion by directing a computer to select 424 names from the total population in the same way that the county selected its weekly venire. He directed the computer to take a random sample of 424 names, 10,000 times. The smallest number of Spanish surnames that was ever drawn was 50.

Though the majority point to other cases in which more than two venires were sampled, they cite no authority, either legal or statistical, to establish that a survey of two large venires is inadequate to assess the operation of a jury selection system. The expert used the statistical decision method approved in other cases alleging unrepresentative jury venires (see *Alston* v. *Manson* (2d Cir. 1986) 791 F.2d 255, 257-258, and cases cited; see also *Castaneda* v. *Partida* (1977) 430 U.S. 482, 494, fn. 13 [51 L.Ed.2d 498, 510, 97 S.Ct. 1272]), employment discrimination (see *Board of Education* v. *Califano* (2d Cir. 1978) 584 F.2d 576, 584, fn. 29) and school segregation (see *Hazelwood School District* v. *United States* (1977) 433 U.S. 299, 308-309 & fn. 14 [53 L.Ed.2d 768, 777-778, 97 S.Ct. 2736]). His statistical

analysis showed results greater than the standard deviation from the norm.[1] In the absence of any evidence that the expert was wrong to think that the evidence before him was adequate to support his conclusion, we have no ground to dispute that conclusion. Here, the two samples were large, and the probability was very low that Hispanics would be as underrepresented as they were. There was at most a one-in-a-thousand possibility that the underrepresentation was attributable to chance. This probability was so low, and the statistical method so well established, that more should not be required.

The majority further reject defendant's claim on the ground that he has not shown systematic exclusion, the third prong of the *Duren* test. No general rule of law emerges from the majority opinion, but it does suggest that a defendant cannot make out a prima facie case under *Duren* if the jury selection system he complains of appears neutral on its face and his only evidence of systematic exclusion is that a cognizable group is significantly underrepresented. "[W]e believe that a prima facie case of systematic exclusion or underrepresentation of a distinctive class is not made merely by demonstrating that the county's race/class *neutral* jury selection processes may nonetheless operate to permit the de facto exclusion of a higher percentage of a particular class of jurors than would result from a random draw." (Maj. opn. at p. 546, italics in original.) Unless the defendant can demonstrate that the underrepresentation was "the immediate and direct result of the state's exemption laws" (*ibid.*), the majority suggest that defendant has no ground for complaint. The implication is that defendant must show that the jury selection system is not neutral on its face, and that he must identify what aspect of the system caused the underrepresentation he complains of.

The Sixth Amendment establishes a defendant's right to be tried by a jury selected from a fair cross-section of the community (*Taylor* v. *Louisiana* (1975) 419 U.S. 522, 526-531 [42 L.Ed.2d 690, 695-699, 95 S.Ct. 692]). The Fourteenth Amendment protects against *intentional* discrimination in the selection of venires (*Castaneda* v. *Partida, supra,* 430 U.S. 482, 492-494 [51 L.Ed.2d 498, 509-510]), but the Sixth Amendment protects against *unintentional* deviations from the constitutional standard. (See *Davis* v. *Zant* (11th Cir. 1983) 721 F.2d. 1478, 1482 & fn. 6; *LaRoche* v. *Perrin* (1st Cir. 1983) 718 F.2d 500, 503 (overruled on other grounds in *Barber* v. *Ponte* (1st Cir. 1985) 772 F.2d 982); *Barber* v. *Ponte, supra,* 772 F.2d 982, 1004-1005, dis.

---

[1]The Supreme Court has explained the statistical model used here, and stated that in a sample of 870 prospective jurors, "[a]s a general rule for such large samples, if the difference between the expected value and the observed number is greater than two or three standard deviations, then the hypothesis that the jury drawing was random would be suspect to a social scientist." (*Castaneda* v. *Partida, supra,* 430 U.S. at p. 497, fn. 17 [51 L.Ed.2d at p. 512].)

opn. of Bownes, J., on rehg.) A defendant may make out a prima facie case that a facially neutral system of selection violates the Sixth Amendment, either by showing that subjectivity is allowed in executing the commands of the statute, and that venires are unrepresentative (see *Davis* v. *Zant, supra,* 721 F.2d 1478, 1482-1485), or simply by showing that the system has the unintended effect of causing a substantial underrepresentation of a particular group. (*People* v. *Harris* (1984) 36 Cal.3d 36, 58 [201 Cal.Rptr. 782, 679 P.2d 433], cert. den. *sub nom. California* v. *Harris* (1984) 469 U.S. 965 [83 L.Ed.2d 301, 105 S.Ct. 365]; *People* v. *Buford* (1982) 132 Cal.App.3d 288, 295-296 [182 Cal.Rptr. 904]; see also *United States* v. *Benmuhar* (1st Cir. 1981) 658 F.2d 14, 19 [defendant made out prima facie case that English proficiency requirement systematically excluded cognizable groups].)

The Sixth Amendment vindicates a democracy's interest in the participation of all groups in the administration of justice. (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42 L.Ed.2d at p. 698]; see *Ballard* v. *United States* (1946) 329 U.S. 187, 195 [91 L.Ed. 181, 186-187, 67 S.Ct. 261]; see also *Williams* v. *Florida* (1969) 399 U.S. 78, 100 [26 L.Ed.2d 446, 460, 90 S.Ct. 1893].) The protection against arbitrary or oppressive power "is not provided if the jury pool is made up of only special segments of the populace or if large, distinctive groups are excluded from the pool. Community participation in the administration of the criminal law, moreover, is not only consistent with our democratic heritage but is also critical to public confidence in the fairness of the criminal justice system. Restricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." (*Taylor* v. *Louisiana, supra,* 419 U.S. at p. 530 [42 L.Ed.2d at p. 698].) The fair cross-section requirement of the Sixth Amendment is substantive, not procedural. It is not satisfied by a facially neutral system which perpetuates the exclusion of disadvantaged groups from the mainstream of government.

Our nation's history is shadowed by too many examples of facially neutral rules which operated to exclude minority groups from their fundamental rights for us to be confident that a neutral law necessarily operates fairly. The poll tax (*Harman* v. *Forsennius* (1965) 380 U.S. 528, 543 [14 L.Ed.2d 50, 60, 85 S.Ct. 1177]), the literacy test (*Louisiana* v. *United States* (1965) 380 U.S. 145, 150 [13 L.Ed.2d 709, 713, 85 S.Ct. 817]), and gerrymandering (*Gomillion* v. *Lightfoot* (1960) 364 U.S. 339 [5 L.Ed.2d 110, 81 S.Ct. 125]) are all apparently neutral methods by which access to the franchise has been unconstitutionally impaired. States have persistently used apparently neutral standards to exclude minorities from juries. (*Hernandez* v. *Texas* (1954) 347 U.S. 475, 478-479 [98 L.Ed. 866, 870, 74 S.Ct. 667]; *Norris* v. *Alabama* (1935) 294 U.S. 587, 589 [79 L.Ed. 1074, 1076, 55 S.Ct. 579].) As early as 1886 the high court was called upon to invalidate an apparently neutral

regulation which, as applied, invidiously discriminated against Chinese business people. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed. 220, 6 S.Ct. 1064].) In the area of employment, apparently neutral employment requirements have been used to perpetuate long-standing discrimination. (See *Griggs* v. *Duke Power Co.* (1971) 401 U.S. 424, 430-431 [28 L.Ed.2d 158, 163-164, 91 S.Ct. 849].) It is no answer to a claim that juries are not drawn from a fair cross-section of the community to explain that the system under which the venires are selected is facially neutral.

Apparently the majority are not certain of their suggestion that a facially neutral system would never violate the Sixth Amendment, as they levy the additional charge against defendant that he cannot prove that the underrepresentation was caused by the system of selection. Defendant's expert evidence was that the probability of the underrepresentation occurring by chance in a random system was so small that it was established that something in the system of selection caused the underrepresentation. Implicit in *Duren* and also in Fourteenth Amendment cases is the understanding that a significant disparity in representation which is not attributable to chance is attributable to the system of selection. (*Duren* v. *Missouri, supra,* 439 U.S. at p. 366 [58 L.Ed.2d at p. 588]; see also *Castaneda* v. *Partida, supra,* 430 U.S. at p. 494, fn. 13 [51 L.Ed.2d at p. 510]; *United States* v. *Benmuhar, supra,* 658 F.2d at p. 19; *Smith* v. *Yeager* (3d Cir. 1972) 465 F.2d 272, 280, cert. den. 409 U.S. 1076 [34 L.Ed.2d 665, 93 S.Ct. 685].) The same logic applies in employment discrimination cases. (*Teamsters* v. *United States* (1977) 431 U.S. 324, 337-340 [52 L.Ed.2d 396, 416-418, 97 S.Ct. 1843]; see also *Hazelwood School District* v. *United States, supra,* 433 U.S. 299, 307-308 [53 L.Ed.2d 768, 777].)

The United States Supreme Court has made it clear that in cases in which defendant seeks to show that the jury selection system violates the Fourteenth Amendment, underrepresentation of a cognizable class is evidence of both discriminatory effect and discriminatory purpose. "In contrast, in Sixth Amendment fair-cross-section cases, *systematic disproportion itself* demonstrates an infringement of the defendant's interest in a jury chosen from a fair community cross section. The only remaining question is whether there is adequate justification for this infringement." (*Duren* v. *Missouri, supra,* 439 U.S. at p. 368, fn. 26 [58 L.Ed.2d at p. 589], italics added.)

Nor is it defendant's obligation in establishing the the prima facie case to show at exactly what point in the system the disparity occurs. It is suggested that because defendant in *Duren* could point to the stage in the jury selection process when women became underrepresented, *Duren* requires defendant to show exactly what caused the underrepresentation. Not so—in *Duren* itself, the court rejected the idea that defendant had to show that the

underrepresentation was not caused by jurors seeking exemptions under provisions which were not subject to attack. (*Duren* v. *Missouri, supra,* 439 U.S. at pp. 368-369 [58 L.Ed.2d at pp.' 589-590].)

Next, the majority suggest that Ventura County is doing all it reasonably can to assure a fair cross-section. (Maj. opn. at p. 549.) The People called a supervisor in the jury commissioner's office who testified that requests for disqualification, exemption or excuse are acted upon by clerks in the jury commissioner's office who make no systematic effort to investigate or verify claims. If a person fails to return the questionnaire and fails to appear for jury service, the jury commissioner's office mails a letter and form soliciting a request for excuse or postponement of service. There is no further effort made to secure the prospective juror's compliance with the summons. The county essentially operates on the honor system. *Of those called during the two weeks studied by defendant, less than a third appeared.* When so few actually appear for service, and so little effort is made to verify the excuses of the vast majority who do not appear, the county can hardly claim that it is doing all that can be done.

The Sixth Amendment right to a jury venire drawn from a fair cross-section of the community is an important one. It serves the goal of fairness to the individual defendant, as well as the broader, democratic goal of assuring the participation of the whole community in the judicial branch of government. Our history warns us against complacency in assuming that these goals will be reached. When social science demonstrates that in fact, our jury venires are not representative of a fair cross-section of the community, we must reexamine the system of selection for flaws.

I would reverse the judgment.

The petition of appellant Morales for a rehearing was denied June 1, 1989. Mosk, J., and Broussard, J., were of the opinion that the petition should be granted.