116 Cal.Rptr.2d 298 (2002)
95 Cal.App.4th 1163
The PEOPLE, Plaintiff and Respondent,
v.
Christopher James HEARN, Defendant and Appellant.
No. F034832.
Court of Appeal, Fifth District.
February 4, 2002.
As Modified on Denial of Rehearing February 27, 2002.
Review Denied May 1, 2002.[**]
*300 Sharon G. Wrubel, under appointment by the Court of Appeal, Pacific Palisades, for Defendant and Appellant.
Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Robert R. Anderson, Senior Assistant Attorney General, Robert P. Whitlock and Leah Ann Alcazar, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

*299 OPINION
ARDAIZ, P.J.

I
This case involves the attempted robbery of a liquor store and murder of the liquor store clerk by three women (Annette R., Jannette Serafin and Barbara Chavez),[1] and a man, appellant Christopher Hearn, on April 9, 1996. The Kern County District Attorney charged appellant in a four-count information with one count of murder, a felony in violation of Penal Code section 187, subdivision (a),[2] with special circumstances that the murder occurred during the commission of a robbery and burglary. (§ 190.2, subd. (a)(17)(A) & (G).)[3] Count 1 also alleged personal use of a firearm during the commission of the offense. (§ 12022.5, subd. (a).) Counts 2 and 3 charged appellant with burglary and attempted second degree robbery. (§§ 460, subd. (b), 664, 212.5, subd. (c).) Counts 2 and 3 also alleged personal use of a firearm. (§ 12022.5, subd. (a).) Count 4 charged appellant with conspiracy to commit robbery and set forth four overt acts: (1) Annette R., Jannette Serafin and Barbara Chavez planned a robbery; (2) Christopher Hearn obtained a gun from Regina Eason to use in the robbery; (3) Jeannette Serafin drove Annette R., Christopher Hearn and Barbara Chavez to Ridgecrest; *301 and (4) Christopher Hearn entered the Village Liquor Store in Ridgecrest.
A jury trial commenced on November 30, 1999. The jury returned its verdicts on December 16, 1999. It found appellant guilty of count 1, murder, finding true the special circumstance that the murder was committed during the commission of a robbery within the meaning of section 190.2, subdivision (a)(17)(A). The jury found the gun allegation not true, and returned no finding on the burglary special circumstance allegation.
The jury was unable to reach a verdict on count 2 (burglary), and the court declared a mistrial as to that count. The jury found appellant guilty of count 3 (attempted robbery), but found the gun use allegation not true. As to count 4, conspiracy, the jury found appellant guilty, but made not true findings on the alleged overt acts that appellant "obtained a gun from Regina Eason to use in the robbery" and not true that appellant "entered the Village Liquor store in Ridgecrest." The jury found true that "Annette [R.], Jannette Serafin and Barbara Chavez planned a robbery," and true that "Jannette Serafin drove Annette R., Christopher Hearn [appellant] and Barbara Chavez to Ridgecrest."
The court sentenced appellant to life in prison without the possibility of parole on count 1, and stayed the sentences on counts 3 and 4 pursuant to section 654.
Appellant timely appeals, and contends: (1) he received ineffective assistance of counsel when defense counsel allowed the introduction of evidence that appellant was in state prison for another offense; (2) he received ineffective assistance of counsel because defense counsel failed to request an addendum to CALJIC No. 2.20; (3) the trial court erred in failing to instruct the jury regarding "flight"; (4) insufficient evidence supported the jury's finding that appellant was a "major participant" in the attempted robbery pursuant to section 190.2; (5) the phrase "major participant" is unconstitutionally vague; (6) he received ineffective assistance of counsel because defense counsel failed to request a jury instruction defining "major participant"; (7) the use of CALJIC No. 2.21.2 violated his due process rights; and (8) the use of CALJIC No. 2.90 violated his due process rights. In the published portion of this opinion we conclude sufficient evidence supported the jury's special circumstance finding of "major participation," that "major participant" is not unconstitutionally vague and that appellant's counsel was not deficient in failing to request a definition of "major participant." In the unpublished portion we reject appellant's other claims of error and affirm the judgment.

II

FACTS
Numerous witnesses presented conflicting testimony regarding the events of April 9, 1996. Many witnesses were impeached with their own prior statements to police. Because appellant raises a sufficiency of the evidence challenge, we present the trial testimony and prior statements of the witnesses in some detail.
On April 9, 1996, an off-duty sheriffs deputy entered the Village Liquor Store in Ridgecrest. He found the store's clerk, Issa Tohmah, lying on his back behind the counter in a pool of blood. The deputy quickly left the store and called 911.
Issa Tohmah had sustained three gunshot wounds, two to the head and one through his left arm. There were no powder burns, and the shots were fired from a large caliber gun, such as a .40 caliber. Five .40 caliber expended casings were found in the store and an additional casing *302 was found on the victim's gurney. Police also found a glass pipe, lighter and colored ski mask near some dumpsters behind the store.
Between 8:30 p.m. and 8:50 p.m. on April 9, witness Brian Holm drove past the Village Liquor store and three people ran in front of his car. They were wearing dark clothing and their faces were covered. Holm thought two of the people were male, between five feet, ten inches and six feet, two inches, and one was a female, much shorter, with a ponytail. He thought the person with a ponytail was carrying a backpack.

Annette R.'s Statements and Trial Testimony
Barstow police detective Frank Espinoza assisted the Ridgecrest police with the murder investigation. On December 5, 1997, he telephoned Annette R. (who was now living in Nevada) and asked her about the robbery and murder. He knew Annette R. because she had previously lived in Barstow and Detective Espinoza was familiar with her. He attempted to tape record the conversation, but only successfully taped portions of Annette R.'s initial statement to police. During the conversation Annette R. stated that she, Chavez, Serafin and appellant went to Ridgecrest to do a robbery. Serafin stayed in the car, and Chavez and Annette R. got out of the car with appellant. Appellant went into the store and there were gunshots, and appellant shot the clerk in the head with a .38 or .357 caliber gun. Annette R. stated that she had better not be arrested or she would change her story and reveal nothing.[4]
Later that same day, Detective Espinoza taped another telephone conversation with Annette R. Annette R. stated she was outside the store when she first heard gun shots, and that she ran into the store and did not see the victim but thought he got shot in the head.
On December 10, 1997, Annette R. was interviewed by Ridgecrest Detective Ortiz. She told Ortiz that she heard two different gttns, and that the clerk shot first and then appellant shot. She believed the victim was shot in the head, but everything was blurry. She stated that appellant shot because the clerk shot first, and that she later heard rumors that appellant said she was the shooter.
At trial, Annette R. testified under a grant of immunity. On April 9, 1996, she was 15 years old and living in Barstow with Barbara Chavez. Chavez and Chavez's cousin Serafin returned to Chavez's house and told Annette they were going to "pull a liq," meaning a robbery. Annette R. agreed to participate. Serafin drove them to Chavez's cousin's house, a woman known to Annette R. as "Gina Dean," whose actual name was Regina Eason. Chavez told Eason they needed a male to go with them to do the robbery, and Eason suggested her brother, appellant, who was across the street. Annette R. went across the street to get appellant. Appellant agreed to go with them to Ridgecrest for the robbery, and Eason gave a gun to appellant and a gun to Chavez. Annette R. was angry she was not given a gun. Eason was to receive a portion of the robbery loot in return.
Serafin then drove Annette R., Chavez and appellant to Ridgecrest. Chavez and Annette R. did not want to commit a robbery in Barstow because they had already been questioned about a previous robbery *303 there. They drank beer and smoked marijuana during the car ride to Ridgecrest. Once in Ridgecrest, they stopped at Chavez's sister Dolores's[5] house. They then went to the home of an unidentified man who suggested the Village Liquor Store as a robbery target. Chavez, Serafin, Annette R. and appellant left to drive by the store. They had two ski masks and were all wearing dark clothing. Appellant, who is about six feet tall, had a ponytail.
They drove back to Dolores's house and waited there until after dark. They then returned to the unidentified man's house to plan the robbery. Serafin was going to wait in the car by the Burger King across the street, appellant would enter the store with a gun and Annette R. and Chavez would enter the store after they had counted to three. Annette R. or Chavez would then duct-tape the clerk. All four of them participated in that conversation planning how the robbery would take place.
The four then went to the liquor store, and Serafin dropped them off. The guns were in the backpack. Appellant entered the store, and Annette R. and Chavez waited outside. Annette R. heard gunshots almost immediately. She ran into the store and saw appellant shoot the clerk more than twice. Appellant said "Fuck you, Cuz," and was leaning across the counter as he shot the clerk. Appellant went around the counter and fired more shots. He then ran out of the store and Chavez and Annette R. ran with him back to Serafin's car.
They drove back to Dolores's house, with appellant and Annette R. lying down in the back seat and Chavez sitting in the front seat. Appellant cried and said he did not mean to do it. They left Dolores's house and returned to Eason's house in Barstow. Chavez and Annette R. told Eason that the clerk had been shot, and appellant said nothing but continued to cry.

Regina Eason's Statements and Trial Testimony[6]
Eason is appellant's sister. At trial she denied supplying any guns for the robbery and denied that appellant and Chavez returned to her house together April 9th. Appellant was drunk and did not arrive with Chavez, who arrived later. Eason did not recall Annette R. being at her house. Eason asked if anyone was killed, and Chavez told her appellant had to shoot to protect them. Eason walked appellant to his mother's residence, and then to his girlfriend April's house. Eason asked appellant if he thought he had killed anyone and he said "No."
Eason was interviewed by Detective Ortiz on December 31, 1997, and on February 24, 1998. Eason initially denied knowing anything, but later admitted she had given a gun to Chavez. She said appellant was present when Chavez and the other girls asked him to participate in a robbery. The group returned and appellant had been drunk and hysterical. Annette R. told appellant he had killed the clerk. Eason stated she had difficulty understanding appellant because he was so upset, but she thought he had shot someone while defending Chavez and Annette R.
In a second tape-recorded interview of Eason she denied many of the statements she initially made. She stated that Chavez returned the gun she had given her because it did not work, and she had heard nothing about a robbery. She explained the change in her story by stating that she made the earlier statements in an attempt to make her brother look better in case he *304 had done something wrong, but she did not know if any of it was the truth.

Jannette Serafin's Statements and Trial Testimony
Serafin testified at trial under grant of immunity. Serafin testified that on the day of the robbery Chavez asked her to give her a ride to Ridgecrest. Chavez brought along Annette R. and a small Black man she had never seen before, called "Tim." She was unsure if appellant was the person she believed was called "Tim." She dropped "Tim," Chavez and Annette R. off in front of the liquor store, and they returned a short time later upset. She did not recall what they talked about and did not recall seeing a gun or bullets.
A prior interview of Serafin taped on December 5, 1997, was played for the jury. At that time Serafin stated that Annette R. and Chavez called the man with them "Tim." Serafin dropped Chavez, Annette R. and "Tim" off in front of the liquor store and then heard shots. Chavez ran to Serafin's car and told her to start it. Serafin did not see a gun, but heard the three keep asking who shot first. Serafin described "Tim" as about the same height as Chavez (short) and very thin.
Serafin was interviewed again on October 20, 1998. The interview was also taped and played for the jury. At that time Serafin stated that Chavez wanted to borrow money from someone in Ridgecrest named Chris or Jay, and Annette R. came along for the ride. She did not know the name of the Black male who also rode with them. She dropped the three off on a corner where they left to go borrow the money. They told her to wait by Burger King so they could get something to eat on their way out of town. She waited 15 or 20 minutes, and heard three gunshots. Chavez came running to her car and seemed hysterical. Chavez and the male told her to drive. She never contacted the police because she was scared.

Dolores Chavez's Prior Statements and Testimony
Dolores Chavez (Dolores), Barbara Chavez's sister who is also known as Nene, testified that she rode with Chavez, Annette R. and Serafin to Ridgecrest. She said a male accompanied them that the other girls called "Chris," but she could not identify appellant as that person. She said the male was thin and had long hair. The group dropped her off at her apartment and returned about 9:00 p.m., two hours later than they had said they would return, and seemed in a rush. Chavez told her to hurry up.
In a separate interview with detectives, Dolores gave a substantially similar statement, and said Chavez told her "Chris" and Annette R. had done it. Dolores said any rumor that Chris had not entered the store was false, but that Chavez had never entered the store.

Other Testimony
Evelyn Roesch, a relative of Barbara and Dolores Chavez and Jannette Serafin, testified that she had a conversation with appellant's brother Frederick Hearn. Detective Ortiz testified Roesch said that Frederick told her that appellant told Frederick he was at the store the night of the shooting and had a gun but ran out of the store when he saw a gun, however Roesch denied the statement at trial. Frederick told Detective Ortiz that the information he (Frederick) had given to Roesch he received from his and appellant's father. At trial, Frederick and appellant's father both denied ever having implicated appellant. Frederick has a mental problem, and sometimes hears voices.

Defense Case
Appellant's wife (then girlfriend) April and his mother both testified that appellant was never gone from his mother's house for more than an hour or so in the weeks surrounding April 9, because April *305 was due to have a baby. They testified appellant never came home crying.
Kenneth Hawkins testified that before becoming imprisoned for a parole violation he asked Annette R. to watch four guns for him which were stored in a Nike bag. The bag also contained ski masks with holes cut out. When Hawkins was released from prison in July 1996, Annette R. told him the guns had been stolen. However, she later told him when she was drunk that she did not mean to do it, it was an accident and she did not "mean to shoot the ol' boy."
Pamela Moore, a friend of Annette R.'s, testified that Annette told her about having committed a robbery like in the movie Menace II Society (New Line 1993). Annette R. said she and her "homey" entered the store, she grabbed a "40 ounce" then went up to the store counter and started firing the gun.
The defense presented the testimony of a forensic analyst that there was no evidence from the crime scene that the shots were fired from across the counter.
Yolanda Jackson testified at Eason's trial that Annette R. had bragged about being the shooter in an attempted robbery at a liquor store.
Analyses of head hairs from a ski cap found outside the liquor store ruled out appellant as their source.

III

DISCUSSION

A B[***]

C. There is Sufficient Evidence that Appellant was a "Major Participant"
As relevant to appellant's next argument, section 190.2, subdivision (d), provides:
"Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by . . . imprisonment . . . for life without the possibility of parole...."
Appellant claims insufficient evidence supports the jury's finding that he was a "major participant" in the robbery and thus the felony-murder special circumstance finding cannot stand. Specifically, appellant argues because the jury made the specific findings appellant did not obtain a gun from Eason, did not use a gun in the attempted robbery, murder or conspiracy and did not enter the store, then the jury could not properly conclude he was a "major participant." Respondent counters that appellant "knew a robbery was planned," he "knew weapons were going to be involved," and that he "apparently gave his accomplices the necessary confidence to go through with the robbery," thereby supporting the conclusion that he was a major participant. We conclude that, when reviewed in the light most favorable to the prosecution, appellant's involvement amounts to "major participation" under any understanding of the phrase.[8]
To determine the sufficiency of the evidence to support a special circumstance finding, we apply the same test used to determine the sufficiency of the *306 evidence to support a conviction of a criminal offense. We review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence, i.e., evidence which is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (People v. Mayfield (1997) 14 Cal.4th 668, 790-791, 60 Cal.Rptr.2d 1, 928 P.2d 485.)
The level of participation required to be a "major participant" was most recently discussed by the Third District in People v. Proby (1998) 60 Cal.App.4th 922, 70 Cal. Rptr.2d 706 (Proby). There the court rejected the defendant's dictionary definition of "major," under which he claimed a common understanding of the word required his role be "`greater in dignity, rank, importance, interest, number, quantity or extent.' " (Id., at pp. 930-931, 70 Cal.Rptr.2d 706.) Instead, the court noted that the common meaning of "major" also includes "`notable or conspicuous in effect or scope'" and "`one of the larger or more important members or units of a kind or group.'" (Ibid.) In applying this less restrictive common understanding of the phrase, the court concluded that sufficient evidence supported a finding of major participation where the defendant provided the actual shooter with the gun used to commit the murder, saw the victim after he was shot but made no attempt to assist him or determine if he was dead or alive, proceeded to the safe, took money from it and left the store.
Other courts have found similar involvement to constitute "major" participation. In People v. Bustos (1994) 23 Cal.App.4th 1747, 1755, 29 Cal.Rptr.2d 112, the court found sufficient evidence supported the special circumstance allegation against Loretto, a codefendant who did not actually attack the victim, when Loretto had committed prior robberies with the attacker, planned the charged robbery with the attacker and fled the scene with the attacker and the loot, leaving the victim to die. In another case, the defendant was also found to be a major participant where the evidence showed he did not intend for the victim to be killed by his accomplice, but he had arranged the accomplice's entry into the victim's house and, once the victim was shot, the defendant carried through with the robbery, leaving the victim there to die and threatening the remaining victim. (People v. Mora (1995) 39 Cal.App.4th 607, 617, 46 Cal.Rptr.2d 99.) That a defendant does not witness the actual killing during the robbery does not necessarily lead to a conclusion the evidence is insufficient to support findings he or she was a major participant. (Proby, supra, 60 Cal.App.4th at pp. 929-930, 70 Cal.Rptr.2d 706.)
We agree with the Proby court's conclusion that "major participant" is not so narrowly defined as requiring the defendant's involvement to be somehow greater than that of his co-participants. However, it is equally clear that a major participant must do something more than merely aid and abet in the crime or else the special circumstances requirement would have no meaning separate from the felony murder rule. A common thread in the cases set forth above finding sufficient evidence of major participant involvement to support the special circumstance finding is that the participants found to be "major" all were people directly involved in the commission of the felonythey were at the crime scene, and somehow had a planned role in, or had helped to effect, the successful completion of the underlying felony.
Thus, in our view, the term "major participant" for substantial evidence purposes is not limited to assumption of what can reasonably be perceived as a *307 leadership role. Rather, "major participant" connotes an active participant in the planning or carrying out of the crime. While one can aid and abet the commission of a crime without participating in the actual planning or commission of the crime, a "major participant" is an individual whose conduct involves the intentional assumption of some responsibility for the actual successful commission of the crime regardless of whether the crime is actually ultimately successful. Thus, participation in planning with intent of facilitating the commission of the crime, or participating in conduct integral to or for the purposes of facilitating the commission of the crime (such as driving a getaway car or acting as a lookout) would constitute major participation.
The standard jury instruction regarding principals is helpful to the evaluation of what constitutes "major participation." "Persons who are involved in [committing] [or] [attempting to commit] a crime are referred to as principals in that crime. Each principal, regardless of the extent or manner of participation is equally guilty. Principals include:
"1. Those who directly and actively [commit] [or] [attempt to commit] the act constituting the crime, or
"2. Those who aid and abet the [commission] [or] [attempted commission] of the crime." (CALJIC No. 3.00.)
Theoretically, all "major participants" would fall within one of these two categories of principals but not all people who fall within the definition of principal based on aiding and abetting would necessarily be "major participants."
We conclude that those individuals who "directly and actively [commit] [or] [attempt to commit] the act constituting the crime" are "major participants" within the meaning of the statute. Further, one may or may not be a "major participant" where one aids and abets the commission of the crime, but the finding that an aider and abettor is a major participant depends on the magnitude of the conduct. As we have noted, the statute expressly reserves for the special circumstance finding conduct that goes beyond that which would constitute a technical basis for culpability. Thus, for purposes of a finding of "major participation," the act constituting aiding and abetting would have to be conduct integral to the crime, even where the defendant did not directly and actively commit the act constituting the crime. For example, a lookout or getaway driver could be a "major participant" despite the fact they may never, for example, enter the liquor store. Likewise, one who planned or orchestrated the commission of the crime but was not present could potentially be a "major participant."
It is this greater participation in the crime that distinguishes between those whose role in the commission of the crime is major as opposed to minor. Necessarily, such a finding is determined by the individual facts of each case. While participation in the crime such as obtaining a gun with awareness of what it will be used for might constitute aiding and abetting, without more the complicity could potentially be construed as minor. While this lesser role constitutes sufficient culpability to make one an aider and abettor, it is distinguishable from conduct that compels the greater punishment that falls on a major participant.
What must also be borne in mind is that "major participation" is not evaluated without regard to state of mind. One does not qualify for the additional punishment of death or life imprisonment without the possibility of parole under section 190.2, subdivision (d) unless one also acts with reckless indifference to human life. Thus, *308 while a lookout may necessarily be integral to the completion of a robbery, not every lookout will necessarily be found to have acted with reckless indifference to human life.
Here, of course, the jury returned not a true finding on the gun use allegation and returned not true findings on the alleged overt acts that appellant "obtained a gun from Regina Eason to use in the robbery" and not true that appellant "entered the Village Liquor store in Ridgecrest." The jury did, however, determine that appellant aided and abetted in the attempted robbery, was guilty of attempted robbery, was guilty of conspiracy, and did reach the conclusion appellant was a "major participant."
We conclude that, though the jury returned not true findings on the gun use allegation and the above listed overt acts, those findings do not necessitate the legal conclusion that appellant was not a major participant. Here, the evidence showed that appellant actively participated in an armed robbery, an inherently dangerous felony: he agreed to participate in an armed robbery, he drove with his accomplices to the store to "scope it out" for a possible robbery, he was involved in planning the details of the robbery, he approached the liquor store with his accomplices and came running back to the vehicle with them after the shooting. Regardless of the jury's failure to agree the prosecution showed beyond a reasonable doubt what role each accomplice played, the evidence established that all four accomplices went to Ridgecrest with a plan to rob a liquor store, concocted a plan where one of them would stay in the car, one of them would enter the store, and the other two would ultimately run into the store to assist in tying the clerk and presumably gathering the loot. The evidence supported a conclusion that appellant did not merely remain in the car and wait for the crime to be carried out. The jury could reasonably conclude that defendant was outside the store waiting to do his part to carry out the plan, and was thwarted in his effort to do so merely by the fact the clerk was shot and his accomplices ran away. However, at that point he had already helped to plan, scope out and implement the robbery. Thus, under the standard we set forth above, the fact the jury concluded there was insufficient evidence that appellant was inside the store or had a gun during the actual killing does not necessarily lead to a conclusion the evidence is insufficient to support findings the defendant was a major participant and acted with a reckless indifference to human life. (Proby, supra, 60 Cal.App.4th at pp. 929-930, 70 Cal. Rptr.2d 706.) Rather, the jury could still reasonably conclude appellant's participation in the planning of the robbery and, knowing his accomplices were armed, accompanying them to the liquor store and fleeing with them after the shooting, leaving the victim to die, constituted major participation. (See Bustos, supra, 23 Cal.App.4th at p. 1754, 29 Cal. Rptr.2d 112.)
Thus, the evidence in this case amply supports the conclusion that appellant directly and actively participated in the acts constituting the robbery whether he was in fact inside the liquor store at the time of the shooting or was outside acting in some other capacity (as the jury concluded). The evidence amply supports the conclusion that appellant was not a mere passive observer or one who encouraged or advised the commission of the crime without taking an active role in ensuring the act was successfully completed. We conclude there is sufficient evidence to support the finding appellant was a "major participant."

D. The Phrase "Major Participant" Is Not Unconstitutionally Vague
In a related argument, appellant maintains the phrase "major participant" *309 is overly vague and, hence, violates due process. "The fundamental policy behind the constitutional prohibition of vaguely worded criminal statutes was stated in Lanzetta v. New Jersey (1939) 306 U.S. 451, at page 453 [59 S.Ct. 618, 83 L.Ed. 888]: `No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids.' This court noted a further purpose of the prohibition in People v. McCaughan (1957) 49 Cal.2d 409, 414 [317 P.2d 974], where Justice Traynor stated, `A statute must be definite enough to provide a standard of conduct for those whose activities are proscribed as well as a standard for the ascertainment of guilt by the courts called upon to apply it.' (Italics added.) The generally accepted criterion is whether the terms of the challenged statute are `so vague that men of common intelligence must necessarily guess at its meaning and differ as to it application.' (Connolly v. General Const. Co. (1926) 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322].") (People v. Superior Court (Engert) (1982) 31 Cal.3d 797, 801, 183 Cal.Rptr. 800, 647 P.2d 76.)
Absolute certainty, however, is not required. Instead, "[d]ue process requires a `"reasonable degree of certainty....'" [Citations.]" (People v. Kelly (1992) 1 Cal.4th 495, 533, 3 Cal.Rptr.2d 677, 822 P.2d 385.) As this court has recognized, "Although a particular statute is somewhat vague or general in its language because of difficulty in defining the subject matter with precision, it will be upheld if its meaning is reasonably ascertainable. [Citation.] Courts must view the statute from the standpoint of the reasonable person who might be subject to its terms. Thus, `[i]t is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited.
The requirement of reasonable certainty does not preclude the use of ordinary terms to express ideas which find adequate interpretation in common usage and understanding.' [Citation.]" (People v. Deskin (1992) 10 Cal.App.4th 1397, 1400, 13 Cal.Rptr.2d 391.) "Because `the proper degree of definition' of eligibility and selection factors often `is not susceptible of mathematical precision,' our vagueness review is quite deferential. [Citations.]" (Tuilaepa v. California (1994) 512 U.S. 967, 973, 114 S.Ct. 2630, 129 L.Ed.2d 750.)
The phrase "major participant" derives directly from the United States Supreme Court's reference to "major participation" in Tison v. Arizona (1987) 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127. We question how language of this country's highest courtthe final arbiter of the United States Constitutioncan be unconstitutionally vague.
In any event, the phrase "major participant" has a plainer meaning and is even more commonly understood than "reckless indifference to human life." Our Supreme Court has previously concluded that "reckless indifference to human life" is sufficiently definite to not require additional instruction. (People v. Estrada (1995) 11 Cal.4th 568, 581, 46 Cal.Rptr.2d 586, 904 P.2d 1197.) "Major" is not used in the statute in a technical sense, nor is it so abstract or obscure a word so as to confuse the average juror. The requirement of Tison v. Arizona, supra, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 and Enmund v. Florida (1982) 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140, that the death penalty not be imposed on a non-killer whose participation was only minor, is adequately conveyed by the statute's use of ordinary and commonly understood terms. "Because the ordinary meaning of the statutory phrase amply communicates the parameters of the [degree of participation] *310 subjecting a defendant to a sentence of death or lifelong incarcerationas articulated in Tisonthe statute is sufficiently certain." (People v. Estrada, supra, 11 Cal.4th at p. 581, 46 Cal.Rptr.2d 586, 904 P.2d 1197.)
Accordingly, we conclude the average juror is able to ascertain and apply the standard. That different perspectives influence the deliberative process due to the variety in each juror's life experiences, and that the question whether someone was a "major participant" in a particular crime may be a difficult one which must be made on a case-by-case basis, does not mean the phrase is unconstitutionally vague.[9] (Cf. People v. Morales (1989) 48 Cal.3d 527, 557-558, 257 Cal.Rptr. 64, 770 P.2d 244; People v. Rodriguez (1986) 42 Cal.3d 730, 782, 230 Cal.Rptr. 667, 726 P.2d 113; People v. Deskin (1992) 10 Cal.App.4th 1397, 1400, 13 Cal.Rptr.2d 391.)

E. Failure to Request "Major Participant" Jury Instruction
Appellant's final claim of error on this issue is that he received ineffective assistance of counsel because defense counsel failed to request an instruction defining "major participant." We summarily reject this argument. Current case law, which was also the law at the time of appellant's trial, made clear that "major participant" is a commonly understood phrase that does not require further definition. (Proby, supra, 60 Cal.App.4th at pp. 933-934, 70 Cal.Rptr.2d 706 [trial court did not err in refusing to instruct on major participant even where such an instruction was requested.]; see also People v. Estrada, supra, 11 Cal.4th at p. 574, 46 Cal. Rptr.2d 586, 904 P.2d 1197.) Appellant cannot meet the standard for prevailing on a claim of ineffective assistance of counsel where counsel did not request an instruction that prevailing professional norms dictated was not required; counsel's decision not to request the instruction may have been a tactical one within the sound discretion of trial counsel. (People v. Lucas (1995) 12 Cal.4th 415, 436-437, 48 Cal. Rptr.2d 525, 907 P.2d 373; see also Strickland, supra, 466 U.S. at p. 694, 104 S.Ct. 2052.)

F.-G.[]

DISPOSITION
The judgment is affirmed.
WE CONCUR: HARRIS and BUCKLEY, JJ.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, only parts I, II, IIIC, D and E, and the Disposition of this opinion are certified for publication.
[**] In denying review, the Supreme Court ordered that the opinion be not officially published. (See California Rules of CourtRules 976 and 977.)
[1] Annette R. and Serafin were granted immunity for their testimony. Chavez was convicted in a separate trial of charges related to the incident at issue here.
[2] All further statutory references are to the Penal Code unless otherwise indicated.
[3] The prosecution initially sought the death penalty against appellant, but dropped its request prior to trial.
[4] As stated previously, the police recording equipment failed, and portions of the interviews were not recorded. The taped portions of the Annette R. interview were played for the jury.
[5] Dolores is periodically referred to as "Nene" in the transcript.
[6] Eason was acquitted of all charges related to this incident in her separate trial.
[***] See footnote *, ante.
[8] We address appellant's contention that "major participant" is unconstitutionally vague later in this opinion.
[9] Nor does the fact we must construct a legally "minimum" interpretation of the phrase in order to meaningfully review the record for sufficiency of the evidence imply unconstitutional vagueness. That we (like jurors) must interpret the term, here for the purposes of appellate review, by no means necessitates a conclusion that jurors are unable to do so for themselves,
[] See footnote *, ante.